### Landis *v.* Zoning Board of Adjustment (et al., Appellant).

Argued January 9, 1964. Before MUSMANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*H. Francis De Lone,* with him *Thomas B. Morris, Jr.,* and *Dechert, Price & Rhoads,* for appellant.

*William R. Cooper, II,* for appellees.

OPINION BY MR. JUSTICE MUSMANNO, March 17, 1964:

The balata tree is a sap-bearing tree which flourishes in the Columbian and Brazilian jungles where

natives chop it down, strip it and guide its juices into containers which they carry to a central area. Here the sap is heated, poured into molds to form blocks which the natives carry on their heads to the nearest river where they are loaded into boats and barges which float down to the sea. At an appropriate seaport the blocks are placed aboard ships which transport them to various parts of the world where, after undergoing various treatments, they become important ingredients in the manufacture of golf balls which bounce from refreshing greenswards wherever men and women meet in friendship and competitive sports.

One of the factories engaged in the transformation of balata into golf balls is located in Hatfield Township, Montgomery County, and is owned by Huntingdon Industries, Inc., the intervening appellant in this case. Here the balata blocks, which have come from the equatorial regions are softened in warm water and the different species are intermixed so as to create a homogeneous compound. This is processed through a milling machine which reduces the mass into small pieces and they in turn are immersed in a hexane solvent which washes away all impurities. The final product is shipped to golf ball manufacturers.

In July, 1962, the Huntingdon Industries, Inc. applied to the zoning board of adjustment in Hatfield Township for a building or zoning permit to erect an industrial plant for processing balata. The area in which the plant was to be constructed was zoned Light Industrial. The board acted favorably on the application and the plant was erected. Persons, who, at the hearing before the board, protested against the granting of the building permit, appealed to the Court of Common Pleas of Montgomery County, which reversed the decision of the board; and Huntingdon Industries, as intervenor, appealed to this Court.

The purpose of zoning regulations is to protect the health and safety as well as the moral and economic well-being of the community. Once these criteria are met, the legislative body may not impose unreasonable conditions on a landowner in the untrammelled use of his property. In *Lord Appeal,* 368 Pa. 121, Chief Justice BELL, quoting from the leading case of *White's Appeal,* 287 Pa. 259, said: " '. . . all property is held in subordination to the right of its reasonable regulation by the government clearly necessary to preserve the health, safety or morals [or general welfare] of the people. . . . There is one matter that is quite certain, the power to thus regulate does not extend to an arbitrary, unnecessary or unreasonable intermeddling with the private ownership of property, even though such acts be labeled for the preservation of health, safety, and general welfare.' "

There is no evidence that the framers of the zoning ordinance here under consideration intended to go beyond the limitations announced above. On the contrary, there is every indication that they wished to improve the general well-being of Hatfield Township, consistent with health, safety and general welfare.

One of the primary concerns of any governing body of any municipality, except those devoted exclusively to recreation and panoramic grandeur, is to make the community attractive to income-producing establishments as well as the esthetic-admiring eye. The owners of property have the right to use it for economic advantage, and those who may be employed on that property should not be deprived of needed remunerative work because of an exaggerated sense of fastidiousness on the part of others. The right of any people to earn their daily bread is of no less importance than that of factory neighbors to have their senses undisturbed by the appearance of a toiling establishment. The sweat on a man's brow, as he earns a livelihood for him-

self and family, is more meaningful to society than the dust-besmeared dew on weeds flourishing on a bare plot of ground deteriorating with inactivity, neglect and abandonment.

The supervisors of Hatfield Township certainly intended that their municipality should be alive with industry and not stagnant with purposeless inactivity. The fact that they zoned an area light industrial shows, in itself, that they favored industrial activity. The permitted uses in that light industrial district reveal more forcefully than any argument the intent of the township fathers. They said in paragraph 2, §901 of their zoning ordinance that the following uses would be permitted in the Light Industrial District: "The manufacture, compounding, assembly or treatment of articles of merchandise from the following previously prepared materials: bone, cellophane, canvas, cloth, cork, rope, cord and twine, plastics, and *natural and synthetic rubber,* feathers, felt, fibre, fur, *glass,* hair, horn, leather, paper, plaster, *metals,* precious or semi-precious stones, shell, tobacco, textiles, wood (excluding planing mills), yarns." (Emphasis supplied.)

The lower court apparently overlooked the whole significance of the ordinance and concluded that the procedure employed by Huntingdon Industries could not be classified as "manufacture, compounding assembly or treatment"; that Huntingdon did not work with "previously prepared materials"; that the balata imported from the equator cannot be classified as "natural and synthetic rubber"; and that what Huntingdon eventually shipped from its plant cannot be categorized as articles of "merchandise."

In its consideration of the ordinance the lower court applied criteria which could not possibly have been intended by the framers of the ordinance. The lower court apparently got so close to the ordinance and analyzed each provision with such technical strict-

ness as to lose sight of its overall intention. It laid down such rhetorical limitations, such pedantic boundaries, and such, what Sir Winston Churchill called, "terminological exactitude," as to emasculate the whole purport and tenor of the ordinance.

. The president of Huntingdon Industries testified that the operation of transforming balata into golf ball covering was a "process." The Court seized on the president's use of the word "process" and stated that "processing" violated the ordinance because the ordinance allowed "treatment" of certain materials, and did not specify "processing." The Statutory Construction Act states that "words and phrases should be construed according . . . to their common and approved usage."[1]

What is "processing but treatment"? The latest edition of Webster's Third International Dictionary (1961) defines "treatment" as: "subjection of something to the action of an agent or *process*." It states that "to *treat*" means to "subject to some *process* to improve the appearance, taste, usefulness, or some other quality." It defines *"process"* as "to put through a special process as . . . (2) to make usable by special *treatment*." In its adjectival sense, *"process"* is defined as "prepared, handled, *treated* or produced by a special process." (Emphasis supplied.)

The interchangeability of these two words "process" and "treatment" are here so evident that to attempt to distinguish between them requires infinitely balanced technological calipers which have no place in measuring the progress, comfort and well-being of a population. To hold back a river of meaning with tweezers of semantic sophistry is to become engulfed in a flood of linguistic chaos.

---

[1] 1937, May 28, P. L. 1019, §33 (46 P.S. §533.)

Finally, on this subject, the Supreme Court of the United States, in interpreting a certain provision of the Clayton Act, said that *"processing"* meant "a mode of *treatment* of materials to be transformed or reduced to a different state or thing." *(Corn Products Refining Company v. Federal Trade Comm., 324 U.S. 726.)* (Emphasis supplied.)

The court below found that the balata product delivered to Huntingdon was not "previously prepared material". Here again the Court compressed the property rights of Huntingdon into a tight pigeon hole wholly removed from the general scope of the ordinance. An ordinance which permits manufacture from such previously prepared materials as bone, canvas, metals, textiles and wood, could not possibly have been intended to exclude the materials which are used by Huntingdon, especially when two of the enumerated permitted articles are "natural and synthetic rubber."

Balata has been recognized as a member of the rubber family: "The only other natural rubbers of any great importance are gutta-percha and balata. Both come from the same species of trees, sapotaceae, the former from the East, the latter from South America." *(Rubber, Gutta-Percha and Balata,* by Franz Clouth, New York, 1903.) "A few rubberlike products, like balata and gutta-percha, come from other trees that can be broadly classified as rubber producing." (Philip G. Cook, Latex, Natural and Synthetic, New York, 1956.)

Edward E. Marshall, president of Huntingdon, testified that balata is a "rubber-like substance." It is interesting to note that the Solicitor of Hatfield Township, in cross-examining Marshall, himself referred to the articles imported by Huntingdon as "solid pieces of rubber."

The lower court said that: "The balata processed by Huntingdon cannot, by any stretch of the imagination, be classified as 'previously prepared material.' "

This interpretation stretches farther than the "natural or synthetic rubber" allowed in the ordinance. The operations heretofore briefly described—the chopping down of the trees, the draining of the sap, the boiling thereof, the cooling thereof, the forming of blocks therefrom, can hardly be considered other than *previous preparation* for the processing or treatment which follows at Huntingdon.

The lower court then found that the refined product sold by Huntingdon was not an "article of merchandise." What else could it be? The court quoted from Black's Law Dictionary and defined merchandise as: "All commodities which merchants usually buy and sell, whether at wholesale or retail; wares and commodities such as are ordinarily the objects of trade and commerce . . ."

Balata is certainly a commodity which is "ordinarily the object of trade and commerce." Without quoting any statistics on the subject, it is evident to any observer that golf products and equipment make up an industry and use whose ramifications are apparent in every part of the United States.

The court held that "Huntingdon is the producer of a component part of a finished product." This certainly would not exclude it from being "merchandise." Cloth, after all, is only a component part of coats, trousers and dresses, but who could possibly argue that it is not merchandise?

The board of adjustment found that even if the operation of the Huntingdon plant would not fall within the permitted uses enumerated in the ordinance, it would be entitled to a special exception. The appellees in their brief have stated that the appellant's balata processing plant would present a fire hazard. If this were a fact, this would in itself be adequate reason for affirming the lower court's decision, but the lower court made no reference whatever to fire hazard

and apparently, after hearing the evidence, did not regard it as of any moment. In addition, the board of adjustment laid down the proviso that: "The finished plant must satisfy the detailed safety regulations of the Bureau of Fire Protection of the Pennsylvania State Police, and the Bureau of Inspection of the Department of Labor and Industry. Representatives of both bodies will inspect the premises to insure compliance." Obviously, if Huntingdon does not comply with these requirements, it can be compelled to do so, and the courts will be open to enforce whatever safeguards are necessary to protect the community in accordance with law.

The jurisdiction of a court of common pleas in cases of this character is to review the findings of a board of zoning adjustment to determine whether they come within the provisions of applicable law and that the factual findings are warranted by the evidence. In arriving at its decision, the court employs its judicial discretion, leaving it to this Court, on appeal, to determine whether that discretion has been abused. We find, upon an examination of the record, that there has been a clear abuse of discretion, an error of law. The order entered by the court below must be and is hereby reversed, with directions that the record be remanded for action not inconsistent with this Opinion.

Mr. Justice JONES and Mr. Justice O'BRIEN concur in the result.