Water Supply and Pollution Control Commission
No. 82-406
No. 82-545

APPEAL OF PUBLIC SERVICE COMPANY OF NEW HAMPSHIRE
APPEAL OF TOWN OF SEABROOK

(New Hampshire Water Supply and Pollution Control Commission)

October 24, 1983

82

*Sulloway, Hollis & Soden*, of Concord (*Robert M. Larsen* on the brief and orally), for Public Service Company of New Hampshire.

*Upton, Sanders & Smith*, of Concord (*Russell F. Hilliard* and *Richard F. Upton* on the brief, and *Mr. Upton* orally), for the Town of Seabrook.

*Casassa, Mulherrin & Ryan*, of Hampton, for the Town of Hampton Falls, joins in the Town of Seabrook's brief.

KING, C.J.   In May 1971, the New Hampshire Legislature passed H.B. 494 (codified at RSA 72:12-a (Supp. 1981)), which created an incentive for the reduction of air and water pollution by exempting air and water pollution control facilities from property taxation over a twenty-five-year period. In these appeals from decisions of the water supply and pollution control commission, the issue is whether a partially-completed pollution control facility is eligible for a proportionate tax exemption under the provisions of RSA 72:12-a (Supp. 1981). We rule that the exemption does extend to pollution control facilities which are under construction, where the purpose of the facility is readily ascertainable and within the coverage of RSA 72:12-a (Supp. 1981).

Public Service Company of New Hampshire (PSNH), on behalf of the owners of Seabrook Station, a nuclear-powered electric generating plant under construction in Seabrook, New Hampshire, applied to the New Hampshire Water Supply and Pollution Control Commission (commission) for a property tax exemption, under RSA 72:12-a (Supp. 1981), for seven taxable water pollution control facilities installed or partially-constructed at Seabrook Station. At its

July 14, 1982, meeting, the commission denied tax exemptions for the four incomplete facilities at the site.

The commission decision was based primarily on an opinion by the New Hampshire Attorney General, dated July 8, 1982, which stated that RSA 72:12-a (Supp. 1981) authorizes an exemption only for pollution control facilities which are complete and operational. PSNH's motion for rehearing was subsequently denied by the commission. On October 13, 1982, the commission granted the exemption for three complete and operational water pollution control facilities at the Seabrook site. The Town of Seabrook's (town) subsequent motion for rehearing was denied by the commission.

This is a consolidated appeal pursuant to RSA 541:6 from the two decisions of the commission which denied in part, and approved in part, PSNH's application for the tax exemption. PSNH appeals the decision of the commission which denied the tax exemption for the four partially-constructed facilities. The town, on the other hand, appeals the commission ruling which granted the exemption to the three complete and operational water pollution control facilities.

At the July 14, 1982, commission hearing on the PSNH tax exemption request, PSNH claimed that each of the four partially-constructed water pollution control facilities exceeded or approached half completion. Counsel for PSNH stated that, of the four facilities, the radioactive liquid waste system and the steam generator blow-down system were each slightly less than fifty percent complete. He also told the commission that the circulating water discharge system was approximately eighty-five percent complete and that the plant floor drain oil separation system was approximately seventy-five percent complete.

Throughout the course of construction of the four incomplete facilities, the town has been imposing property taxes on the real estate and fixtures of each facility. The current tax liability of the four facilities is based on an estimated total cost of completion of $43,000,000.

■■ In construing the meaning of RSA 72:12-a (Supp. 1981), our inquiry is limited to the language of the statute itself. *See Caswell v. BCI Geonetics, Inc.*, 121 N.H. 1048, 1050, 437 A.2d 321, 322 (1981). We are also guided by the well-settled principle of this court that a tax exemption statute is construed to give full effect to the legislative intent of the statute. *See Gilford v. State Tax Commission*, 108 N.H. 167, 168–69, 229 A.2d 691, 693 (1967); *Young Women's Christian Ass'n v. Portsmouth*, 89 N.H. 40, 42, 192 A. 617, 618 (1937).

■ We do not agree with the argument that a tax exemption law is to be construed restrictively against the taxpayer seeking the exemption. *See Gilford v. State Tax Commission, supra* at 168, 229 A.2d at 693; *Kimball v. Potter,* 89 N.H. 234, 235, 196 A. 272, 273 (1938). On the contrary, we have resisted treating with judicial disfavor a taxpayer who seeks an exemption. *Young Women's Christian Ass'n, supra* at 42, 192 A. at 618; *see Appeal of Denman,* 120 N.H. 568, 571, 419 A.2d 1084, 1087 (1980). Consequently, without adherence to any formal rule of statutory construction, we examine the language of RSA 72:12-a (Supp. 1981) in light of its legislative objective.

RSA 72:12-a (Supp. 1981) provides in pertinent part as follows:

> "Any person, firm or corporation which *builds, constructs, installs, or places in use* in this state any treatment facility, device, appliance or installation *wholly or partly for the purpose* of reducing, controlling or eliminating any source of air or water pollution shall be entitled to have the value of said facility and any real estate necessary therefor, or a percentage thereof determined in accordance with this section, exempted from the taxes levied under this chapter for a period of 25 years. The party seeking the exemption shall file an application with the water supply and pollution control commission if the exemption sought is for a water pollution control facility. ... Said application shall describe the facilities and their function or functions and shall state the applicant's total investment therein and the portion allocable to each function. The commission shall investigate and determine whether the purpose of the facility is solely or only partially pollution control. If the commission finds that the purpose of the facility is only partially pollution control it shall determine by an allocation of the applicant's investment in the facility what percentage of the facility is used to control pollution. In making its investigation, the commission may inspect the facility ...."

(Emphasis added.)

■ Due to the absence of a formal legislative history of RSA 72:12-a (Supp. 1981), we must glean the intent of the legislature from the plain meaning of the language of this statute and a prior statute. Taken as a whole, the clear intent of the statute is to create tax incentives for industry to construct pollution control facilities. We think that the legislature, in considering HB 494, recognized the often lengthy and expensive process of constructing facilities which

reduce pollution, and were concerned that the payment of property taxes on these facilities might inhibit future construction. It is also our view that the legislature passed HB 494 in order to remove the substantial obstacle to building pollution control facilities posed by the property tax. Therefore, in light of the larger purpose of the statute to encourage construction of pollution control facilities by mitigating the impact of property taxation, we can only conclude that the legislature intended to begin the twenty-five-year tax exemption at the outset of construction, rather than at the completion of these long-term projects.

While not disputing the statute's objective to stimulate the construction of pollution control facilities, the attorney general's opinion argues that the tax incentive would not be adversely affected by allowing a municipality to tax pollution control facilities during construction. The opinion reasons that since the tax exemption applies for a fixed period of twenty-five years, the tax incentive, as a practical matter, remains the same, whether it begins at the start of construction or at the completion of the facility. We disagree.

It is clear to this court that the economic benefits from a tax exemption which begins immediately, at the start of a long-term, expensive construction project, outweigh the value of a tax exemption which begins at the future completion of the project. It is a well-known precept of tax accounting that it is worth more to have tax savings in hand, to utilize or invest, than to wait for the prospect of future tax savings. Here, PSNH, like any taxpayer, would prefer to save a tax sum immediately at the commencement of construction, and invest it, than to accept a promise of similar tax savings at the future completion of the project. Further, because of the likely depreciation of a water pollution control facility, the average taxable value—hence, the tax savings—of such a facility would likely be lower over a twenty-five-year exemption period which began to run at the conclusion of construction, than it would be over a twenty-five-year period beginning immediately, during construction.

The argument favoring the deferred exemption also fails to consider that property taxes imposed during construction are often capitalized by the owner of a facility and added to the total cost of a facility. Thus, an exemption from property taxes which begins at the start of construction would lower the cost of completing a pollution control facility, thereby reducing interest costs and depreciation over the life of the facility.

◼ Finally, for further guidance about the underlying policy of RSA 72:12-a (Supp. 1981), we look at the commission's position that a municipality, in determining the tax treatment of pollution control facilities, should consider that "the investment made by industry on behalf of pollution control is not productive, but rather, an investment being made by the company on behalf of the general welfare of the public." Summary of Discussions, N.H. Water Supply and Pollution Control Comm'n (Oct. 10, 1973). It would be inconsistent with this policy of treating industry investment in pollution control as a public benefit, for a municipality to tax the conferral of the public benefit throughout the course of construction. This particular form of taxation would act as a disincentive to industries contemplating the construction of pollution control facilities.

◼ Having determined the legislative intent of RSA 72:12-a (Supp. 1981), we now construe the language of the statute itself. We do not agree with the argument that the plain meaning of RSA 72:12-a (Supp. 1981), taken as a whole, is to authorize tax relief only for a completed pollution control facility. There is no express language in the statute which states that a pollution control facility must be complete before it can become eligible for the twenty-five-year tax exemption. On the contrary, the literal meaning of the statute's words indicates that the exemption can be applied to facilities which are under construction. The statute, in present-tense language, extends eligibility to any person who *"builds, constructs, installs or places in use"* (emphasis added) a pollution control facility.

◼◼ RSA 72:12-a (Supp. 1981) empowers the commission to grant the exemption as soon as it can make a determination, based upon the application for the exemption, that the relevant facility will be "wholly or partly" used "for the purpose" of controlling pollution. The statute does not expressly state that application for the exemption can be made only after completion; application can be made at any time. Further, there is no language in the statute which indicates that the twenty-five-year exemption period is triggered only when construction is finished; the twenty-five-year period can run at any time.

◼ It is apparent to this court, that if the legislature intended to make completion and operation of a pollution control facility a condition of tax exemption eligibility, it would have expressly required in the statute that a facility be *built, constructed or installed.* Moreover, if the legislature sought to prevent a partially-completed facility from receiving the exemption, it could have legis-

lated that an application for the exemption could not be submitted until the facility was complete or that the twenty-five-year period must run from the date of completion.

The statutory precursor to RSA 72:12-a (Supp. 1981), RSA 149:5-a (repealed 1971), supports the view that if the legislature had intended to exempt only complete and operational facilities from property taxation, it would have done so in the language of the statute. RSA 149:5-a contained explicit language authorizing a tax exemption for only those *facilities* which were constructed or placed in operation: "[A]ny treatment facility, device, appliance or installation (whether consisting of real or personal property or a combination of both) *built, constructed or placed in operation* by any person . . . shall be exempt from taxes. . . ." Laws 1955, 196:1 (codified at RSA 149:5-a, repealed 1971) (emphasis added). In 1971, the legislature repealed the statute and changed the tense of the language in the adopted version, as well as making the exemption applicable to any "person" rather than any "facility", with the result that any person who "builds, constructs, installs or places in use" pollution control facilities is now eligible for the tax exemption. RSA 72:12-a (Supp. 1981).

This change in the tense and application of the statute compels us to conclude that the legislature wished to change the statute's meaning. If the legislature had intended to limit the tax exemption to completed facilities, it would have retained the limiting language of the predecessor statute. If we accept the view that this change in the statute was insignificant, we would be disregarding our rule that a statute is to be construed according to its plain meaning.

The 1973 decision of the commission which denied the property tax exemption for a facility which was not complete and operational is not persuasive. See Record in No. 82-406 at 23. This commission ruling amounted to "an administrative practice not to exempt incomplete pollution control facilities from RSA Chapter 72 taxation." While we recognize that the commission's interpretation of RSA 72:12-a (Supp. 1981) is entitled to our consideration, it is based upon a misconstruction of the statute. *See N.H. Dept. of Rev. Administration v. Public Emp. Lab. Rel. Bd.*, 117 N.H. 976, 977, 380 A.2d 1085, 1086 (1977).

The 1973 decision of the commission was based on the commission's claimed inability "to determine that percentage of the facility investment which is actually effective in the control of water pollution." However, the commission's rationale confuses the test of eligibility for the tax exemption. RSA 72:12-a (Supp. 1981) extends

the exemption to "any person . . . which builds . . . any treatment facility . . . *wholly or partly for the purpose* of reducing . . . pollution. . . ." (Emphasis added.) Thus, the statutory inquiry is the "purpose" of the facility and not its effectiveness in controlling pollution.

■ From the description of the common pollution control system and the schematic drawings, as well as from the prior approvals of design and discharge limits made by the pertinent State and federal agencies, it was clear that the essential purpose of each facility was water pollution control. The fact that each of the four partially-constructed facilities exceeded or approached half-completion, at the date of the commission hearing, would have enabled the commission to determine whether the facilities in question actually served a pollution control purpose.

■ We are convinced that if a municipality is able to calculate the tax liability with respect to a partially-completed utility plant, it should be able to determine the tax value of an incomplete and non-operational pollution control facility. In the interest of preserving the symmetry and fairness of taxation of pollution control facilities, facilities which are partially complete should be subject to taxation and remain eligible for the tax exemption.

The town contends that the *quid pro quo* for the grant of a property tax exemption under RSA 72:12-a (Supp. 1981) is the conferral of an immediate public benefit. It reasons that since a partially-completed pollution control facility cannot be placed in use and cannot provide a present public benefit, an incomplete facility should not be eligible for the tax exemption.

■ There is nothing in RSA 72:12-a (Supp. 1981) which mandates the conferral of an immediate public benefit as the *quid pro quo* for the receipt of the tax exemption. Moreover, the town relies on case law construing the charitable use property tax exemption provided by RSA 72:23, V. However, the charitable use exemption is specifically limited to property which is used and occupied. In pertinent part, RSA 72:23, V extends the tax exemption to "[t]he real estate and personal property owned by charitable organizations and societies . . . and *occupied and used* by them for the purposes for which they are established. . . ." (Emphasis added.) As discussed above, RSA 72:12-a (Supp. 1981) does not require that a pollution control facility be placed in use as a condition of entitlement to the tax exemption.

Both the commission and the town contend that the extension of the tax exemption to pollution control facilities under construction would make administration of RSA 72:12-a (Supp. 1981) difficult.

Specifically, the commission and the town argue that the determination of the percentage of a facility which is devoted to pollution control, as required by statute, could not be made prior to completion of the facility. We disagree.

■ In the instant case, an inquiry could have been made into what portion of each facility was allocable to pollution control, as only one facility was not designed to be used exclusively to reduce pollution. The single exception, the steam generator blow-down system, was sufficiently close to fifty percent complete, at the time of the commission hearing, to have enabled the commission to determine that a substantial part of the facility would be installed entirely for pollution control purposes. We see no reason why a determination of the percentage of a facility which is used to control pollution could not be made in those cases where the purpose of that facility can be readily ascertained.

■ Finally, the town expresses concern that PSNH or any other applicant for tax relief, after receipt of the exemption, may discontinue construction of the pollution control project. In the instant case, the record does not support the town's concern. PSNH was approximately fifty percent through completion of the entire pollution control project at the time it sought the exemption, and there was no evidence to indicate that it intended to abandon the project upon receipt of the exemption.

■■ We conclude that the commission erroneously decided that RSA 72:12-a (Supp. 1981) authorizes an exemption from property taxation only for water pollution control facilities which are complete and operational. We vacate the commission order, dated July 22, 1982, denying PSNH a tax exemption for incomplete facilities, and remand the case to the commission to determine the eligibility of those facilities for the tax exemption under RSA 72:12-a (Supp. 1981) in accordance with our opinion. We affirm the commission decision of October 13, 1982, granting PSNH a tax exemption, as of April 1, 1983, for the complete and operational facilities.

*Reversed in part; affirmed in part; remanded.*

SOUTER, J., did not sit; the others concurred.