Water Supply and Pollution Control Commission
No. 84-180

# APPEAL OF TOWN OF HAMPTON FALLS

## (New Hampshire Water Supply and Pollution Control Commission)

July 26, 1985

806

*Casassa, Mulherrin & Ryan*, of Hampton (*John J. Ryan* on the brief and orally), for the Town of Hampton Falls.

*Sulloway, Hollis & Soden*, of Concord (*Robert M. Larsen* on the brief and orally), for Public Service Company of New Hampshire.

*Shaines, Madrigan & McEachern*, of Portsmouth (*John H. McEachern* on the brief and orally), for the Town of Hampton, as amicus curiae.

DOUGLAS, J. In this appeal from a decision of the New Hampshire Water Supply and Pollution Control Commission (WSPCC), we

are asked to determine whether the WSPCC erred in ruling that the circulating water discharge tunnel at Seabrook Station reduces and controls thermal discharge pollution and, therefore, is exempt from real property taxes under RSA 72:12-a (Supp. 1983). We affirm.

In January 1982, Public Service Company of New Hampshire (PSNH), representing all of the owners of the Seabrook Station, a nuclear-fueled electric generating station under construction in Seabrook, applied to the WSPCC for a property tax exemption, pursuant to RSA 72:12-a (Supp. 1983), for seven otherwise taxable water pollution control facilities installed or partially constructed at Seabrook Station. The WSPCC, on July 14, 1982, denied tax exemptions as to four of the facilities on the basis that they were not complete and operational and, hence, were not eligible for exemption under RSA 72:12-a (Supp. 1981). This court, in a decision rendered on October 24, 1983, concluded that partially completed facilities are eligible for tax exemption "where the purpose of the facility is readily ascertainable and within the coverage of RSA 72:12-a (Supp. 1981)," and remanded the matter to the WSPCC for further consideration. *Appeal of Public Serv. Co. of N.H.*, 124 N.H. 79, 82, 89, 470 A.2d 855, 856, 861 (1983).

On January 11, 1984, PSNH filed with the WSPCC an updated application for a property tax exemption for the four remaining taxable water pollution control facilities. The WSPCC held a hearing on the matter on January 12, 1984, at which time testimony regarding the tax exemption eligibility of the facilities was received from interested parties. In a decision dated February 2, 1984, the WSPCC granted the requested exemption as to all four facilities. The Towns of Hampton Falls and Seabrook filed motions for rehearing, which were denied.

This appeal, brought by the Town of Hampton Falls (town) pursuant to RSA 541:6, challenges only the WSPCC's granting of a complete exemption from real estate taxes of the circulating water discharge tunnel. On appeal, the town advances two claims in support of its argument that the WSPCC erred in granting a complete tax exemption with respect to the circulating water discharge tunnel. The town argues first that the circulating water discharge tunnel is not a pollution control device within the meaning of RSA 72:12-a (Supp. 1983). Alternatively, the town maintains that the facility is not entitled to a *complete* tax exemption under RSA 72:12-a (Supp. 1983).

The circulating water system, or condenser cooling system, consists of 19-foot-diameter reinforced concrete intake and discharge

tunnels, a pumphouse and a piping system interconnecting these components. It is a "once-through system" that provides cooling water to the main condensers of Seabrook Station. The circulating water system uses sea water from the Atlantic Ocean to cool the condenser in the steam cycle and to remove the heat. The intake tunnel, which is 17,160 feet in length, draws the sea water into Seabrook Station. The discharge tunnel, the facility at issue in this appeal, carries the heated water from the plant and, through the use of diffusers, disperses the heated water rapidly into the ocean, cooling the effluent, which is approximately 39 degrees above ambient when it leaves the plant. The discharge tunnel is approximately 16,500 feet in length, extending from the plant into the Atlantic Ocean. Portions of the tunnel run through the towns of Seabrook, Hampton and Hampton Falls.

We turn first to the town's argument that the circulating water discharge tunnel is not a pollution control device within the meaning of RSA 72:12-a (Supp. 1983). This presents two subsidiary questions: Whether the thermal discharge is "pollution" and, if so, whether the discharge tunnel controls the pollution in a manner consistent with the purpose of RSA 72:12-a (Supp. 1983). That section, entitled "Water and Air Pollution Control Facilities," provides in part:

> "Any person, firm or corporation which builds, constructs, installs or places in use in this state any treatment facility, device, appliance or installation wholly or partly for the purpose of reducing, controlling or eliminating any source of air or water pollution shall be entitled to have the value of said facility and any real estate necessary therefor, or a percentage thereof determined in accordance with this section, exempted from taxes levied under this chapter for a period of 25 years."

■ At the outset, we note that we will construe RSA 72:12-a (Supp. 1983) "to give full effect to the legislative intent of the statute." *Appeal of Public Serv. Co. of N.H.*, 124 N.H. 79, 83, 470 A.2d 855, 857 (1983). In *Appeal of Public Service Company of New Hampshire*, we determined that "[t]aken as a whole, the clear intent of the statute is to create tax incentives for industry to construct pollution control facilities." *Id.* at 84, 470 A.2d at 858. Stating that the legislature "recognized the often lengthy and expensive process of constructing facilities which reduce pollution," *id.* at 84–85, 470 A.2d at 858, we concluded that "the larger purpose of the statute [is] to

encourage construction of pollution control facilities by mitigating the impact of property taxation." *Id.* at 85, 470 A.2d at 858.

▉ RSA 72:12-a (Supp. 1983) directs that the WSPCC, in the case of a water pollution control facility, has the authority to determine whether and to what extent the facility is used to control pollution. Hence, the legislature has entrusted the WSPCC with primary responsibility to administer RSA 72:12-a (Supp. 1983). Accordingly, the WSPCC's interpretations of the terms of RSA 72:12-a (Supp. 1983) are entitled to great deference, unless an interpretation is in clear conflict with the express statutory language. *See Hamby v. Adams,* 117 N.H. 606, 609, 376 A.2d 519, 521 (1977).

We first consider whether thermal discharge is pollution. Although the legislature employed the term "pollution" without elaboration, its use of the phrase *"any source* of air or water pollution," RSA 72:12-a (Supp. 1983) (emphasis added) evinces a legislative intent to construe the term broadly.

▉ In this jurisdiction, statutory words and phrases are interpreted according to their common and approved usage, unless the term has a technical or otherwise peculiar meaning. RSA 21:2. The common meaning of the term "pollution" is "[t]he contamination of soil, water, or the atmosphere by the discharge of noxious substances," THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1015 (1981). Reference to that common meaning sheds little light on the answer to the technical question whether a particular substance, discharged in a particular place and in a specific quantity, constitutes pollution. Accordingly, the term falls into the latter category, and in determining whether thermal discharge can be a pollutant, we refer to the Water Pollution Act, RSA chapter 149 (1977 & Supp. 1983) where the term "pollution" takes on technical significance.

▉ Reference to the Water Pollution Act is in accord with the "familiar principle in statutory construction that all statutes upon the same subject-matter are to be considered in interpreting any one of them." *Campton v. Plymouth,* 64 N.H. 304, 309, 8 A. 824, 825 (1886); *O'Brien v. Manchester,* 84 N.H. 492, 495, 152 A. 720, 722 (1930).

> "It is assumed that whenever the legislature enacts a provision, it has in mind previous statutes relating to the same subject matter. . . .
>
> . . . .

> Unless the context indicates otherwise, words or phrases in a provision that were used in a prior act pertaining to the same subject matter will be construed in the same sense."

2A N. SINGER, SUTHERLAND STATUTORY CONSTRUCTION § 51.02, at 453–54 (4th ed. 1984) (footnotes omitted).

RSA chapter 149 (1977 & Supp. 1983) does not define the term "pollution." By regulations promulgated pursuant to RSA 149:4, XVII, for the purposes of interpreting and implementing the chapter, however, the WSPCC has defined "pollutant" as "any introduced gas, solid, or liquid matter which renders a resource unfit for a specific use." 5 N.H. ADMIN. RULES, Ws 431.02(f). *See also* RSA 149:1, III, IV (waste defined as including any substance harmful to human, animal, fish or aquatic life).

A review of RSA chapter 149 (1977 & Supp. 1983) and the regulations promulgated thereunder reveals that thermal discharge can be a source of pollution. In RSA 149:3, the legislature sets forth the classifications of surface waters of the State, *see* RSA 149:1 ("'Surface waters of the state' means streams, lakes, ponds and *tidal waters* within the jurisdiction of the state . . ."), and prescribes the standards applicable to each class. The legislature specifically mentions temperature, stating: "Any stream temperature increase associated with the discharge of . . . cooling water shall not be such as to appreciably interfere with the uses assigned to [the] class." RSA 149:3, II (class B waters); RSA 149:3, III (class C waters); RSA 149:3, IV (class D waters). *See* RSA 149:3, IV-b (tidal waters shall satisfy all conditions contained in RSA 149:3, II [class B waters]). The legislature further provided: "In prescribing minimum treatment provisions for *thermal wastes* discharged to interstate waters, the commission shall adhere to the water quality requirements and recommendations of the New Hampshire Fish and Game Department, the New England Interstate Water Pollution Control Commission, or the National Technical Advisory Committee of the Department of the Interior, whichever requirements and recommendations provide the most effective level of *thermal pollution control.*" RSA 149:3, V-a (emphasis added). The WSPCC, in prescribing the criteria for water quality standards, specifically includes "temperature" as a criterion and sets forth the applicable standards relating to temperature. 5 N.H. ADMIN. RULES, Ws 432.09.

■■ Both the legislature and the WSPCC, the entity charged with the administration of the Water Pollution Act, *see* RSA 149:2, :4, recognize that a thermal discharge can be a source of pollution. Accordingly, we conclude that when heated water discharged into

surface or interstate waters increases the temperature of such water so as to render the water unfit for its normal use or to change unduly its condition, the thermal discharge is a source of pollution under both RSA chapter 149 (1977 & Supp. 1983) and RSA 72:12-a (Supp. 1983). It is clear that the thermal discharge in the instant case, which is 39 degrees above ambient when it leaves the plant and which involves 1.2 billion gallons of water a day, is pollution within the meaning of RSA 72:12-a (Supp. 1983).

We now turn to the town's claim that the circulating water discharge tunnel is not a pollution control device within the meaning of RSA 72:12-a (Supp. 1983). Under RSA 72:12-a (Supp. 1983) a pollution control facility is "any treatment facility, device, appliance or installation wholly or partly for the purpose of reducing, controlling or eliminating any source of air or water pollution."

The substance of the town's argument is that because the discharge tunnel merely transports the heated water to a point where the cooling will occur through dispersion into the ocean, it is the ocean waters, and not the tunnel, which control the pollution. Therefore, the town argues, the discharge tunnel is not a pollution control facility and thus is not exempt from real property taxes under RSA 72:12-a (Supp. 1983). As authority for its position the town cites *Ohio Ferro-Alloys Corp. v. Donahue*, 7 Ohio St. 2d 29, 218 N.E.2d 452 (1966).

In *Ohio Ferro-Alloys Corp. v. Donahue*, the Supreme Court of Ohio considered whether a chimney constructed for the purpose of diffusing smoke qualified as a "pollution control facility." The court stated that "[a]dmittedly, nothing is removed from [the] smoke by the facility. Everything that goes in at the bottom of the chimney goes out at the top." *Id.* at 30, 218 N.E.2d at 454. Reasoning that the purpose of the statute in question was to reduce or eliminate the total amount of air pollution within the State, the court concluded that "the cumulative effect of many minor contributions to general air pollution will not be lessened if everyone merely builds a smokestack." *Id.* at 31, 218 N.E.2d at 454.

We are not persuaded by this analysis. RSA 72:12-a (Supp. 1983) does not require that the facility for which the tax abatement is sought actually *remove* the source of pollution but, rather, it requires that the facility reduce, control *or* eliminate the pollution.

The environmental problems associated with discharging heated cooling water are well documented in the record. The staff of the WSPCC, in an inter-departmental communication dated February 2, 1984, stated:

> "[T]here is no question that the condenser cooling water discharge to the Brown's River would have been com-

pletely unacceptable because of the disastrous effect it would have had on the entire marsh as well as Hampton Harbor. Obviously, the River could not accommodate the amounts and temperatures of the heated water involved without annihilating the aquatic life and its substrate. Likewise, the discharge of the cooling water directly to Hampton Harbor would undoubtedly have had a devastating effect on the valuable marine resources in the area."

██ The purpose of the circulating water discharge tunnel is to transport the heated water beyond the estuarine system to an offshore point of discharge and, by means of diffuser heads, to discharge rapidly the heated water into the Atlantic Ocean. By so transporting and diffusing the cooling water, the thermal pollution is dissipated, thus minimizing the effects of the thermal discharge on the estuarine system. Hence, it is clear that the circulating water discharge tunnel reduces and controls thermal pollution in a manner consistent with the purpose of RSA 72:12-a (Supp. 1983). We therefore conclude that the WSPCC did not err in finding that the circulating water discharge tunnel is a pollution control device within the meaning of RSA 72:12-a (Supp. 1983). We find no merit in the town's argument that because the discharge tunnel confers no public benefit on the town, it is not entitled to an exemption under RSA 72:12-a (Supp. 1983). *See Appeal of Public Serv. Co. of N.H.*, 124 N.H. at 86, 470 A.2d at 858 (industry investment in pollution control is a public benefit).

We now turn to the town's final argument; namely, that the WSPCC erred in granting a *complete* tax exemption with respect to the circulating water discharge tunnel. RSA 72:12-a (Supp. 1983) provides in part:

> "The commission shall investigate and determine whether the purpose of the facility is solely or only partially pollution control. If the commission finds that the purpose is only partially pollution control it shall determine . . . what percentage of the facility is used to control pollution . . . [and] shall notify the applicant and the taxing authorities of the municipality where the facility is situated . . . what percentage of the applicant's investment in the facility should be allocated to pollution control."

██ Our review of this decision is narrow. First, findings of the WSPCC are deemed prima facie lawful and reasonable. *See* RSA 541:13; RSA 149:14; *see also Appeal of Kelleher*, 124 N.H. 274, 280, 469 A.2d 1322, 1326 (1983). Second, this court will not overturn

a decision of the WSPCC unless the appellant meets its burden of proving, by a clear preponderance of the evidence, that the agency's decision is unjust, unreasonable or unlawful. *See Appeal of Kelleher supra.*

In its application for tax exemption, PSNH stated:

"In order to meet the operational and functional demands of the condenser cooling system, heated circulating water could be discharged to the Brown's River. Obviously, the Brown's River is incapable of receiving the physical quantity of water (854,000 [gallons per minute]) or the heat without environmental damage. Hence the entire circulating water discharge tunnel is dedicated to pollution control . . . ."

The town interpreted this statement to mean, and thus argued before the WSPCC, that the discharge tunnel serves two distinct and separate functions: first, it eliminates the environmental damage caused by the volume of water; and, second, it controls the environmental damage caused by the thermal discharge. The substance of the town's argument was that the rapid discharge of 854,000 gallons of water per minute, entirely aside from the fact that the water is heated, cannot be handled in an environmentally sound manner unless it is carried quite a distance from the plant. The town took the position that even though the rapid discharge of such a large amount of water would cause environmental damage, the cause of that damage could not be characterized as a "pollutant." Hence, the town argued, the discharge tunnel is only partially a pollution control facility and, consequently, only a partial tax exemption may be granted with respect to that facility under RSA 72:12-a (Supp. 1983).

The WSPCC, however, in ruling that the facility is entitled to a complete tax exemption, expressly found that "[t]he *sole* purpose of the facility is to minimize the effects of the thermal discharge on the marine ecosystem by transporting the heated cooling water to an offshore point of discharge." (Emphasis added.) It is this finding that the town challenges on appeal.

Bruce Beckley, Manager of Nuclear Projects for PSNH, testified at the hearing on the application for tax exemption. In response to the town's argument, he reiterated the purpose of the circulating water system and emphasized that the sole purpose of the discharge tunnel is to transport a large volume of heated water. He testified that the functions of the tunnel cannot be separated in the manner advanced by the town because, without the heat, there would be no need to discharge water. Certain other testimony indicated that the

two functions cannot be separated in the manner asserted by the town because the volume of water is inversely proportional to the temperature of the water discharged.

Moreover, the staff of the WSPCC, in a communication dated February 2, 1984, concluded that the discharge tunnel is eligible for a complete tax exemption under RSA 72:12-a (Supp. 1983). In so concluding, the staff opined:

> "With regard to the contention . . . that the discharge tunnel has two functions, . . . the staff has the following comments. First, the staff concurs with the assertion made by the company . . . that the method used to remove waste heat (a pollutant), and the volume of water necessary to transport and disperse the waste heat in an environmentally acceptable manner cannot be viewed as serving separate functions. Secondly, the staff believes that the discharge tunnel is analogous, albeit on a much larger scale, to an outfall from a waste water treatment facility, the sole purpose of which is to carry pollutants to a receiving body of water and discharge them in a manner that will minimize adverse environmental impacts."

 This court does not sit as a trier of fact in reviewing findings of the WSPCC. See Appeal of Kingswood Trust & Savings Bank, 123 N.H. 7, 12, 455 A.2d 1027, 1030 (1983). "As we have stated before, we are reluctant to substitute our judgment for the expertise of administrative officials." Id. The finding at issue is supported by the record, and we are not convinced by a clear preponderance of the evidence that the WSPCC's decision was unreasonable or unlawful. See Appeal of Kelleher, 124 N.H. at 280, 464 A.2d at 1326.

 Finally, the Town of Hampton, as amicus curiae, argues that the WSPCC violated the due process rights of the town and that the record lacks specific evidence to support the WSPCC's ruling. Neither issue has been raised by the parties to this appeal. Although an amicus curiae is permitted to make useful suggestions to the court on matters of law which may escape the court's attention, Blanchard v. Railroad, 86 N.H. 263, 266, 167 A. 158, 159–60 (1933), an amicus curiae is bound by the issues presented by the parties. See Cerri v. Russell, 31 Colo. App. 525, 530, 506 P.2d 748, 751 (1973), aff'd, 184 Colo. 282, 519 P.2d 1189 (1974); see also Endress v. Brookdale Community College, 144 N.J. Super. 109, 123 n.6, 364 A.2d 1080, 1087 n.6 (1976). Thus, we decline to consider the additional issues raised by the Town of Hampton.

Accordingly, we affirm the WSPCC's ruling that the circulating water discharge tunnel reduces and controls thermal discharge pollution and, therefore, is completely exempt from real property taxes under RSA 72:12-a (Supp. 1983).

*Affirmed.*

All concurred.