Air Resources Council
No. 87-224

## APPEAL OF CITY OF BERLIN

### (New Hampshire Air Resources Council)

December 28, 1988

*Upton, Sanders & Smith*, of Concord (*Richard F. Upton* on the brief and orally), for the plaintiff.

*Sulloway Hollis & Soden*, of Concord (*Maureen D. Smith* and *Robert M. Larsen* on the brief, and *Ms. Smith* orally), for the defendant James River Corporation.

BATCHELDER, J. This case presents an appeal by the City of Berlin from an administrative decision made by the State Air Resources Council (the agency) that certain facilities and real estate owned by the James River Corporation qualified for tax exemption under RSA 72:12-a (Supp. 1988). For the reasons that follow, we affirm in part and reverse in part.

The James River Corporation (the company), successor company to the Brown Paper Company, has manufacturing facilities located in Berlin. In 1978, the federal Environmental Protection Agency (EPA) tested the air quality in the Berlin area and found that it did not meet the national air quality standards for sulfur dioxide ($SO_2$) or particulate matter. *See* 42 U.S.C.A. § 7407(d)(1)(B) (1983). As a consequence of these findings, Berlin was designated a "non-attainment" area for $SO_2$ and particulate matter, and the company was required to reduce $SO_2$ and particulate output to levels which would achieve the ambient air quality standards set by the federally approved State Implementation Plan (SIP) for the Berlin area. *See* 42 U.S.C.A. § 7410 (1983).

In addition to the boiler involved in this case, the company uses several oil-burning boilers to generate heat for the manufacturing process. Oil-burning boilers emit $SO_2$ into the atmosphere. Some paper companies have installed bark-burning boilers, which can be fueled by bark and wood waste removed from pulpwood in the paper manufacturing process. Bark-burning boilers emit virtually no $SO_2$ when fueled with bark or other wood waste.

In 1981 the company completed construction of a bark-burning boiler, the No. 14 boiler, as a substitute for two existing oil-burning boilers (boilers Nos. 6 and 7). The No. 14 bark-burning boiler was

completed, along with three new stacks and an ambient air monitoring system, pursuant to a consent decree entered into by the EPA, the State of New Hampshire, and the company in 1979. When fueled with bark, operation of the No. 14 boiler as a substitute for the oil-burning boilers had the effect of reducing the ambient $SO_2$ levels in the Berlin area.

In March 1981, the company filed an application with the agency for a tax exemption on three new facilities, the No. 14 bark-burning boiler, three tall stacks, and an ambient air monitoring system. Shortly thereafter, the company agreed to withdraw its tax exemption application for several years as part of a negotiated settlement with the City of Berlin (the city) in a real property tax dispute. The settlement agreement expired on April 1, 1985. On December 31, 1985, the company resubmitted an application for a tax exemption.

After holding hearings to accept evidence from the company and the city, the agency ruled upon requests for findings of fact submitted by the parties and the specific requests for tax exemptions. The agency ruled as follows:

(1) The No. 14 bark-burning boiler stack is accorded a 100% exemption.

(2) The real estate associated with the bark-burning boiler and its integral components is entitled to a 73.21% exemption.

(3) The real estate associated with the mechanical dust collector is accorded a 100% exemption.

(4) The real estate associated with the I.D. [Induced Draft] fan motor building is accorded a 94% exemption.

(5) The real estate associated with the wet scrubber system is accorded a 100% exemption.

The city objected to the agency rulings and requested a rehearing. On May 21, 1987, the agency denied the city's motion for rehearing based on lack of new evidence, and this appeal challenging the agency's first two rulings ensued.

New Hampshire law allows a party

". . . which builds, constructs, installs, or places in use in this state any treatment facility, device, appliance, or installation wholly or partly for the purpose of reducing, controlling, or eliminating any source of air or water pollution . . . to have the value of said facility and any real estate necessary therefor, or a percentage thereof deter-

mined in accordance with this section, exempted from [property] taxes . . . for a period of 25 years."

RSA 72:12-a (Supp. 1988). The division of air resources shall accept, investigate, and rule upon applications for this exemption. *Id.*

"If the division finds that the purpose of the facility is only partially pollution control it shall determine by an allocation of the applicant's investment in the facility what percentage of the facility is used to control pollution . . . and notify the taxing authorities . . . what percentage of the applicant's investment in the facility should be allocated to pollution control."

*Id.*

The city argues that the real estate associated with the No. 14 bark-burning boiler and its integral components is not entitled to any tax exemption under RSA 72:12-a (Supp. 1988). In support of its argument, the city asserts that RSA 72:12-a (Supp. 1988) presupposes the existence of a continuing source of pollution; that neither the boiler nor the bark burned in it is ". . . a treatment facility, device, appliance, or installation" as required by RSA 72:12-a (Supp. 1988); and that the company built the bark-burning boiler primarily for economic rather than pollution control purposes.

Alternatively, the city argues that even if the real estate associated with the No. 14 boiler is entitled to a partial exemption, the agency erred in failing to reduce the allowed percentage by an additional amount to reflect the "substantial economic benefits" received by the company.

Additionally, the city claims that since the tall stack only performs very minor pollution control functions, the agency erred in granting it a 100% exemption.

The company argues that the agency properly applied the criteria of RSA 72:12-a (Supp. 1988) to the facts contained in the record when it allowed a 73.21% partial tax exemption for bark-burning boiler No. 14 and a 100% tax exemption for the boiler stack.

The company points to the 80% drop in $SO_2$ levels in the Berlin area after the installation of the No. 14 boiler as evidence that, when viewed as an integrated whole, the No. 14 boiler system acts as a pollution control facility within the meaning of RSA 72:12-a (Supp. 1988). In its brief, the company further asserts that the statutory language, ". . . for the purpose of reducing, controlling, or eliminating any source of air or water pollution . . .," does not limit exempt facilities to those which are "tacked onto existing

machines, structures, or facilities with the single purpose and effect of reducing the pollution otherwise caused."

 Our scope of review over agency decisions under RSA 72:12-a (Supp. 1988) is narrow. *See Appeal of Town of Hampton Falls*, 126 N.H. 805, 812, 498 A.2d 304, 309 (1985). Agency findings are deemed *prima facie* lawful and reasonable, and this court will not sit as a trier of fact in reviewing them. *Id.* at 812–13, 498 A.2d at 309. However, this court will overturn agency decisions when the appellant shows by a clear preponderance of the evidence that the agency's decision is unjust, unreasonable or unlawful. *Id.*

██ The clear intent of RSA 72:12-a (Supp. 1988) was to create tax incentives for industry to construct pollution control facilities. *Appeal of Public Serv. Co. of N.H.*, 124 N.H. 79, 84, 470 A.2d 855, 858 (1983). However, we do not think that the legislature intended to grant across-the-board tax breaks for all investments in new manufacturing equipment which private industry needs or wants to install and which may pollute less than their predecessors.

Several other States have enacted "primary purpose" pollution control statutes which allow tax exemptions for facilities which are operated for the primary purpose of eliminating, reducing, or preventing pollution. *See, e.g.,* ILL. REV. STAT. ch. 120, para. 439.2a (Smith-Hurd 1979); WASH. REV. CODE § 82.34.030 (1987); ME. REV. STAT. ANN. tit. 36, §§ 656(1)(E)(2), 1760(30) (1978). It appears that the company's application for tax exemption of the bark-burning boiler might be denied under a "primary purpose" statute. For example, a newly installed bark-oil boiler was not a water or air pollution control facility for tax exemption purposes under Me. Rev. Stat. Ann. tit. 36, §§ 656(1)(E)(2), 1760(30). *Ethyl Corp. v. Adams*, 375 A.2d 1065, 1073–79 (Me. 1977). In *Shell Oil Co. v. Illinois Dept. of Revenue*, 453 N.E.2d 125, 128 (Ill. App. Ct. 1983), changes in a refinery's fuel system and construction of storage tanks for asphalt were not tax-exempt under the Illinois primary purpose statute, even though the changes were subjectively motivated by a desire to comply with EPA sulfur emissions requirements, since the court found that their primary purpose was to enable the plaintiff to use less expensive fuels in its refinery while still complying with EPA regulations. The court also affirmed the trial court's determination that the new smokestacks were tax exempt. *But see Weyerhaeuser Co. v. State Dept. of Ecology*, 86 Wash. 2d 310, 545 P.2d 5 (1976) (in case where a papermill replaced three existing boilers with one new and larger boiler designed to meet $SO_2$ emissions standards, the court rejected

an "all or nothing" interpretation of the State's primary purpose statute and found that a partial approval scheme for a facility which performed both pollution control and manufacture of products functions was not an unreasonable way to implement the statute).

■ Our legislature, however, has not adopted a "primary purpose" statute. The case at hand turns upon the statutory interpretation of the tax exemption allowed under RSA 72:12-a (Supp. 1988) for air pollution control facilities. That statute exempts all, or a percentage, of ". . . any *treatment* facility, device, appliance, or installation wholly or partly for the purpose of reducing, controlling or eliminating any source of air or water pollution . . . [,] and any real estate necessary therefor . . . ," from property taxes for twenty-five years. RSA 72:12-a (Supp. 1988) (emphasis added). Hence, the statute requires that there first be an air pollution *treatment* facility before the agency can make any tax exemption investigations or decisions regarding the facility. To construe the statute otherwise would be to ignore the word "treatment" in RSA 72:12-a (Supp. 1988).

■ A "treatment" is the subjection of something to some action or process with a special end in view, the end often being to improve the quality of the thing undergoing treatment. *See Landing v. Zoning Board of Adjustment of Hatfield*, 198 A.2d 574, 576–77, 414 Pa. 146, 151–52 (1964); *Krienke v. Southwestern Superior Products Corp.*, 376 S.W.2d 936, 938 (Tex. Civ. App. 1964) (citing 87 C.J.S. 925 (1954)).

■ To obtain a tax exemption under RSA 72:12-a (Supp. 1988), as it is written, the applicant must have a facility, device, appliance or installation which "treats" something for the purpose of air or water pollution "reduction, control, or elimination."

In the instant case, the company built a bark-burning boiler system which produces energy by burning bark. The bark-burning boiler does not emit $SO_2$ pollution into the air because it does not create $SO_2$. Thus, no treatment is undertaken, and the bark-burning boiler is not a *treatment* facility, device, appliance or installation, and neither it nor the real estate under it qualifies for tax exemption under RSA 72:12-a (Supp. 1988). If the legislature had wanted to exempt from taxation facilities using non-polluting fuels or new non-polluting manufacturing processes, it could have done so. We will not question the efficacy of this policy decision.

As to the property associated with the tall stack, we find that there is sufficient evidence in the record to support the agency's finding that the stack does function to disperse pollutants, and we are thus not convinced by a clear preponderance of the evidence that the agency decision was unreasonable or unlawful. The use of a stack in this situation is analogous to the use of a discharge tunnel to control thermal discharge pollution, which we have already held to be eligible for tax exemption under RSA 72:12-a (Supp. 1988). *Appeal of Town of Hampton Falls,* 126 N.H. 805, 814–15, 498 A.2d 304, 309 (1985).

██ Accordingly, we find that the real estate under the No. 14 bark-burning boiler is part of a new energy source rather than a treatment facility, and reverse the agency's decision that it qualifies for tax exemption under RSA 72:12-a (Supp. 1988). We affirm the agency's ruling that the No. 14 stack is exempt from property taxes under RSA 72:12-a (Supp. 1988), and we remand the case for proceedings consistent with this opinion.

*Affirmed in part; reversed in part; remanded.*

All concurred.