## 20116

McMILLEN FEED MILLS, INC., OF SOUTH CAROLINA, Appellant, v. J. Harold MAYER and Walterboro Production Credit Association et al., Respondents. COASTAL PRODUCTION CREDIT ASSOCIATION, Respondent, v. J. Harold MAYER and Master Feed and Grain Company, Appellants.

(220 S. E. (2d) 221)

*Messrs. Marshall B. Williams,* of Orangeburg, *and Drawdy & Nicholson,* of Columbia, *for Appellants,* cite:

502

*Messrs. Smoak and Smoak,* of Walterboro, *for Respondent,* cite: 

November 25, 1975.

GREGORY, Justice:

These consolidated cases involve the priority between certain advances made pursuant to three recorded mortgages of real estate dated February 14, 1961, and a junior mortgage of real estate dated May 17, 1962. The issues were referred to the Master in Equity for Colleton County for determination and report. The Master found that Coastal's mortgages and the subsequent advances made pursuant to the future advance clauses thereof, held priority over McMillen's mort-

gage. McMillen alone filed exceptions to the Master's Report and the Circuit Court affirmed the Master's findings with minor revisions. The case is here on appeal by McMillen from the Decree For Foreclosure and Sale by the Circuit Court.

On February 14, 1961, the Defendants Mayer executed and delivered to Walterboro Production Credit Association a promissory note in the principal sum of Forty Thousand and No/100 ($40,000.00) Dollars, designated as Note B. On the same day the Defendants Mayer executed and delivered to the Association three mortgages of real estate as security for the repayment of said note. One of these mortgages covered a lot at Edisto Beach in Charleston County and was duly recorded in said county on February 17, 1961. The second of said mortgages covered a lot of land with buildings and improvements located thereon in Bluffton, Beaufort County and was duly recorded in said county on February 18, 1961. The third of these mortgages covered a tract of fifty (50) acres, more or less, in Colleton County, and was duly recorded in said county on February 17, 1961. Each of these mortgages expressly recited that they were given as security for the repayment of the sum of "Forty Thousand and No/100 Dollars ($40,000.00), evidenced by note of even date * * *," and as security for such future advances as the Association might make to the Mayers.

These mortgages each recited that the "undersigned (J. H. Mayer and/or Amaryllis A. Mayer) has granted, bargained, sold, conveyed and mortgaged, and by these presents does hereby grant, bargain, sell, convey and mortgage, * * * unto Lender, its successors and assigns" the lands described therein:

"In consideration of the advances made and which may be made by Lender (the Association) to J. H. Mayer and Amaryllis A. Mayer, Borrower * * * aggregating Forty Thousand and No/100 ($40,000.00) Dollars (evidenced by note(s) of even date herewith expressly made a part

hereof), and to secure in accordance with Section 45-55, as amended, Code of Laws of South Carolina, 1952,

"(1) All existing indebtedness of Borrower to Lender (including but not limited to the above described advances), evidenced by promissory notes and all renewals, and extensions thereof,

"(2) All future advances that may subsequently be made to Borrower by Lender, to be evidenced by promissory notes, and all renewals and extensions thereof, and

"(3) All other indebtedness of Borrower to Lender, now due to become due or hereafter contracted."
the maximum principal amount of all existing indebtedness, future advances, and all other indebtedness outstanding at any one time not to exceed One Hundred Thousand Dollars ($100,000.00) plus interest thereon, attorney's fees and Court costs * * *."

It was further expressly stated in said mortgages that:

"It is understood and agreed that all advances heretofore, now or hereafter owed by Borrower to Lender, and any other present or future indebtedness or liability of Borrower to Lender, whether as principle debtor * * * or otherwise, will be secured by this instrument until it is satisfied of record. * * *

and

"This agreement shall inure to the benefit of Lender, its successors and assigns, and any successor or assign of Lender may make advances hereunder, and all advances and all other indebtedness of Borrower to such successor or assign shall be secured hereby. The word 'Lender' shall be construed to include the Lender herein, its successors and assigns."

On January 1, 1966, by "Farm Credit Administration Order Amending Articles of Incorporation and Certificate Of District To Be Served Of Production Credit Association," the name of the Association was changed from Walter-

boro Production Credit Association to Coastal Production Credit Association. The Association will hereinafter be referred to as "Coastal."

Thereafter, and on December 12, 1961, and while retaining these recorded mortgages as security, Coastal advanced to the Mayers an additional Forty Thousand ($40,000.00) Dollars and secured from the Mayers a promissory note designated as Note D. On March 8, 1962, and while retaining said mortgages as security, Coastal advanced to the Mayers an additional Seven Thousand Five Hundred ($7,-500.00) Dollars and secured from the Mayers a promissory note designated as Note E.

In 1961, Master Feed and Grain Company was financing and selling turkey feeds to the Defendants Mayer and in connection therewith extended credit to them. As evidence of their indebtedness to Master, the Mayers executed and delivered five certain promissory notes to Master dated April 10, 1961, June 7, 1961, April 10, 1961, June 9, 1961, and "21-8-1961" (sic.), actually August 21, 1961. The Mayers did not make payment to Master as required by the terms of these notes and, on May 17, 1962, Master secured from the Mayers as security for the repayment thereof, a mortgage of real estate. The mortgage expressly recited that it is given to secure * * * certain notes or obligations bearing dates of 4-10-61; 6-7-61; 4-10-61; 6-9-61 and 21-8-1961 (sic.)." This mortgage describes the identical parcels of land as were described in the three earlier mortgages to Coastal and same was, on June 15, 1962, July 13, 1962, and August 4, 1962, duly recorded in the Counties of Colleton, Beaufort and Charleston.

The Charter of Master Feed and Grain Company, Incorporated, was amended and, by amendment, the same was changed to McMillen Feed Mills, Inc. By undated assignment, appearing on the back of each, the notes by April 10, 1961, were assigned by Master Feed and Grain Company, Inc., to McMillen Feeder Finance Corporation. Hereinafter,

Master Feed and Grain Company will be referred to as "McMillen."

When they began their business transactions with Coastal, the Mayers knew that they would require financing annually. In executing the mortgages to Coastal on February 14, 1961, the Mayers clearly understood that the mortgages were open-end mortgages and were security, not only for the contemporaneous debt, but, for future advances as well. Since they required annual financing, the Mayers considered the use of such mortgages convenient. Basically, the Mayers secured advances twice annually from Coastal. The larger advances were made in the fall of each year and the smaller advances were made in the spring. The notes executed in the fall would come due the following fall and the notes executed in the spring would come due the following spring. Consequently, there was overlapping of indebtedness from the Mayers to Coastal.

Subsequent to May 17, 1962, the date upon which the junior lien of McMillen attached to the lands, the Mayers, pursuant to the future advance provisions of Coastal's prior recorded mortgages, applied to and received from Coastal thirteen additional advances, each evidenced by an individual promissory note.

The Mayers' indebtedness to Coastal, evidenced by the notes, were all paid, with the exception of the indebtedness represented by Notes designated J, M, and N. Note J, in the amount of $8,000.00, dated February 3, 1964, was made for the purchase of a tract of land in Colleton County designated as the Hiott Tract. Mr. Mayer executed a mortgage with the same open-ended provisions of the 1961 mortgages on this property in favor of Coastal. Appellant concedes that Respondent's mortgage is the first and only mortgage on this tract.

The Mayers' indebtedness to McMillen, as represented by notes dated June 7, 1961, June 9, 1961, and August 21, 1961, were paid. The two notes both dated April 10, 1961, re-

mained unpaid. Since no payments were made to McMillen as to the two notes dated April 10, 1961, due and payable on October 10, 1961, and October 24, 1961, respectively, an action was instituted for foreclosure of McMillen's mortgage of May 17, 1962. Thereafter, Coastal brought action to foreclose the three mortgages executed by the Mayers to it and dated February 14, 1961. Additional mortgages are involved in the foreclosure suit but their priority is conceded by both Coastal and McMillen and discussion of them is irrelevant to the basic issue on appeal.

Appellant has presented four basic questions to be resolved on appeal:

1. Was the Trial Court in error in holding that Coastal had no knowledge, actual or constructive, of the intervening mortgage of McMillen after the taking and recording of Coastal's mortgages in February 1961? (Exceptions 11, 15, 16, 17, 27 and 28.)

2. Was the Trial Court in error in holding that advances made in reliance on an open end mortgage of real estate took priority over an intervening lien of which the holder of the open end mortgage had both actual and constructive notice? (Exceptions 1 through 10 and 14, 18, 19, 20, 21, 22, 23, 24, 29, 32, 33 and 34.)

3. Was the Trial Court in error in holding that mortgagor was indebted to Coastal at all times after February 1961 when the testimony is to the contrary? (Exceptions 12, 13 and 25.)

4. Was the Trial Court in error in holding that advances were made pursuant to the Coastal mortgages of February 1961 rather than in reliance on Coastal's mortgage of February 1964? (Exceptions 30 and 31.)

Resolution of all four questions can be handled in discussion of the one basic issue presented in the case: Whether the lien of a mortgage or real estate drawn as security for a contemporaneous debt and for future advances has priority

to the extent of such future advances and to the extent of the principal amount stated therein even though such advances were made subsequent to the attaching of a junior mortgage covering the identical lands.

Prior to 1934, it was "* * * well settled that a mortgage may be so drawn as to secure future advances and subsequent indebtedness * * *," And "* * * such mortgage is valid against subsequent creditors." *Ex Parte American Fertilizing Co.* (1922), 122 S. C. 171, 115 S. E. 236. It was equally well settled that such mortgage drawn to secure future advances and subsequent indebtedness was preferred over junior encumbrances as to advances made before actual notice to the senior mortgages of the junior lien, but was postponed as to advances made after actual notice thereof. *National Bank of Chester v. Gunhouse, supra; Lake v. Shumate,* 20 S. C. 23. Under this rule, the interest of a mortgagee under a mortgage drawn to secure future advances was superior to the subsequent interest of one who hold a later lien, as to all advances made in ignorance of such subsequent encumbrance, even if such advances are made after the subsequent encumbrance attaches to the property.

Several of these cases seem to postpone advances made by the senior mortgage to the claim of the junior encumbrance either from the date of the junior encumbrance or from the date of its record, treating the latter's registry as constructive notice to the prior mortgagee, but, in all such cases, the proposition was stated in the abstract or else the facts did not present a case for its application. *Hirshkind v. Israel,* 18 S. C. 157; *Norwood v. Norwood, supra; Ex Parte American Fertilizing Co., supra.*

It was noted in 36 Am. Jur. Mortgages, Sec. 235, p. 809, that:

"There are * * * authorities holding that the recording of the instrument creating the later lien * * * constituted a constructive notice to the mortgagee, so that all advances made thereafter are deemed to have been made with knowledge of the existence of (the) inferior lien * * *."

However, the majority and more logical rule (See Annotation, 138 A. L. R. 566) appears to be as stated in 59 C. J. S., Mortgages, Section 258, page 325, wherein it is observed that:

"* * * the record of the junior lien is not sufficient notice to the senior mortgages to deprive him of priority in respect of advances made after it has attached * * *. Actual notice is necessary."

Thus, it was the doctrine in a majority of the jurisdictions and in this state prior to 1934, that the interest of a mortgagee under a mortgage given us a security for future advances was superior to the interest of a subsequent mortgage as to all advances made in ignorance of such subsequent encumbrance, even though such advances were made after the subsequent lien attaches to the property, and, in the absence of actual notice of an inferior lien, the mortgage given as security for future advances was valid as against such subsequent lien. And it was the general rule "that before a holder of a mortgage to secure future advances could be deprived of his superior equity on the ground of notice of an intervening interest, actual notice thereof must be brought to his attention. Under this rule, the person interested in limiting the future advances must give notice." 36 Am. Jur., Mortgages, Section 235, page 809. See also, 59 C. J. S. Mortgages, Section 258, page 325.

The case law that had evolved prior to 1934 obviously did not seem satisfactory to the Legislature, for, in 1934, and again in 1960, the Legislature acted with respect to mortgages drawn as security for future advances. Doubtlessly, and as stated in 59 C. J. S. Mortgages Section 230 page 297. "* * * a statute may give priority to a particular lien * * *."

In 1934, the General Assembly enacted Act No. 867, entitled:

"An act providing for securing existing indebtedness and for future advances and providing for the priority of same."

The Act of 1934 was codified as Section 8712-2 in the 1942 Code and appears as Section 45-55 in the 1952 Code. In 1960, the General Assembly, by Act No. 745, appearing on page 1731 of the Acts and Joint Resolutions, Amended Section 45-55. The purposes, scope and effect of this Act are wholly comprehended in its title. As amended, the statute, Section 45-55 South Carolina Code of Laws, 1962, in pertinent part, is as follows:

"Any mortgage * * * creating a lien on * * * real estate, securing existing indebtedness or future advances to be made, regardless of whether such advances are to be made at the option of the lender, shall be valid from the day and hour when recorded so as to affect the rights of subsequent creditors, whether lien creditors or simple contract creditors, * * * to the same extent as if such advances were made as of the date of the execution of such mortgage * * * for the total amount of advances made thereunder, together with all other indebtedness and sums secured thereby, the total amount of existing indebtedness and future advances outstanding at any one time may not exceed the maximum principal amount stated therein * * *."

The language of the Act and of the Amendment is totally clear and unambiguous, and, as stated in *Gunnels v. American Liberty Insurance Co.,* 251 S. C. 242, 161 S. E. (2d) 822 (824), "when the terms of a statute are clear and not ambiguous, there is no room for construction and the Courts are required to apply such according to their literal meaning."

The body of the Amendment in no way restricts the intention of the Legislature as expressed in its title.

South Carolina cases are legion which espouse the rule that the expression of legislative intent is the principle of first order in statutory interpretation. As stated in *Lewis v. Gaddy,* 254 S. C. 66, 173 S. E. (2d) 376 (378), "all rules of statutory construction are subservient to the one that legislative intent must prevail if it can be reasonably discov-

ered in the language used and that language must be construed in the light of the intended purpose." The statute, as amended, is readily and soundly susceptible only of the construction that it was the legislative intent to abrogate and delimit the then existing rule and to establish the priority of such advances to the same extent as if such advances had been made on the date of the execution of the mortgage. It is stated in 59 C. J. S. Mortgages, Section 230, at page 297, that:

"A mortgage given to secure future advances to be made to the mortgagor may become a prior lien for the amount actually lent * * * although the advances are not made until after subsequent mortgages * * * have come into force (and) * * * such a mortgage has been regarded as operating from the time of recording, although the advances may not be made until a later date."

The adoption of the Act and amendment indicates persuasively that a departure from the earlier doctrine was intended. Neither are declaratory of the prior rule, but are in obvious derogation thereof. The operative force and effect of the Act and Amendment can only be construed as an abrogation of the earlier rule of priority, qualified by notice, and the substitution therefor of the statute as the only law on the subject of priority. It appears quite clearly that it was the manifest intention of the Legislature to establish and protect the priority of such mortgages "for the total amount of (all) advances made thereunder" and accomplished this by employing a "relation back" theory which gives such mortgages priority of lien:

"* * * from the date and hour recorded (and) to the same extent as if such advances were made as of the date of the execution of such mortgage."

As stated in 21 S. C. L. R. 646, footnote 42:

"South Carolina is unique in the fact that it grants priority for all future advances, even optional ones. Almost every

other state limits the grant of priority, relating back to the time of recording, to obligatory advances."

The obvious purpose of the legislation was to make the fact of its execution and recording sufficient, in and of itself, to establish the priority of such mortgages over any and all subsequent liens and encumbrances and to extend the limits of such priority back to the date and hour of recording. Thus, subsequent advances made pursuant to such mortgages have priority of lien although other encumbrances have come into being before such advances were made. By statute, all future or additional advances, for the purpose of establishing priority, are regarded as though they had been made on the date of the execution of the mortgages.

It is Appellant's position that a senior mortgagee's notice of subsequent liens of a junior mortgagee affects the priority of advances made subsequent to the junior liens even though the senior mortgage was drawn to secure further advances.

The language of Section 45-55 of the 1962 Code, is plain and unambiguous and conveys a clear and definite meaning. It is not susceptible of misinterpretation. The position urged by McMillen would do violence to the expressed legislative intent and is so repugnant to the statute, that its adoption would, in effect, deprive the Act of its efficacy and render its provisions nugatory.

Section 45-55 of the 1962 Code has changed the law of notice to the extent that a junior mortgagee is on notice that the priority of a senior mortgage drawn so as to secure future advances is preserved and maintained for future advances provided in the recorded instrument even though such advances may be made after notice of the attaching of subsequent interests. Thus, absent special circumstances or unconscionable conduct on the part of the senior mortgagee, the holder of a "prior in time" mortgage with a provision for future advances retains his priority as to all future advances made as against a junior or subsequent lienholder even though such advances are made after notice

of the intervening mortgage has been brought to the attention of the senior mortgages. In view of this we find it immaterial whether or not Coastal had knowledge, actual or constructive, of McMillen's intervening mortgage. A review of the transcript, however, reveals no notice, actual or constructive, on the part of Coastal.

McMillen cites *Fulmer Building Supplies, Inc. v. Martin, et al.*, 251 S. C. 353, 162 S. E. (2d) 541 (1968) in support of its position that notice to the senior mortgagee of a junior lien destroys the priority of subsequent advances made pursuant to the senior mortgage. This 1968 decision involved Section 45-55 of the 1962 Code. Section 45-55 of the 1952 Code as amended is identical thereto. The basic issue before the Court in *Fulmer* concerned the priority between a mechanic's lien filed by Fulmer and an advance made pursuant to a previously recorded mortgage executed by the landowner. That *Fulmer* can be readily distinguished from the matter now before the Court is obvious when read carefully. As noted in an article entitled "Mechanic's Liens" appearing on pages 645-646 of the South Carolina Law Review, Volume 21, No. 4, "the conflict between Section 45-55 and 45-255 was the real issue" in *Fulmer*. By Section 45-255, certain statutory duties and obligations were imposed upon the mortgagee to protect the perfected mechanic's lien. Since the mortgagee undertook to exercise complete control in the disbursement of the mortgage funds and took it upon itself to pay the final installment as the contractor directed, the mortgagee became the owner's ALTER EGO and was bound by the owner's mortgagor's statutory duties and obligations to protect the mechanic's lien. These statutorily imposed duties and obligations were disregarded by the mortgagee and the Court, according to its view of the equities of the case, concluded that in doing so, the mortgagee lost its priority as to the advance made after the perfection of the mechanic's lien. Here there is no conflict between statutes. In *Fulmer*, statutory duties and obligations were imposed upon the owner (Martin), and, through the

owner, upon the mortgagee, to protect the lien of *Fulmer*. Here, there are no such statutory duties or obligations imposed by statute upon Coastal. *Fulmer* does not support McMillen's position that, notwithstanding the language of Section 45-55, as amended, the priority of a mortgage drawn to secure future advances and subsequent indebtedness is qualified in all situations to the extent that advances made after notice of a subsequent lien will be postponed in favor of and subordinated to the junior lien.

In future argument of its second charge of error, Appellant contends that while a mortgage drawn to secure future advances is valid, it is necessary for the viability of such mortgage that there be a debt or balance outstanding at all times following execution. We find it unnecessary to address this issue. The Lower Court found that the Mayers were indebted at all times after February, 1961 (the date of the open-ended mortgages in question). Notwithstanding some testimony to the contrary, we concur that the record supports this finding.

Finally, Appellant charges error in the Lower Court's finding that advances made subsequent to February, 1961, were made pursuant to Coastal's mortgages of February, 1961, rather than in reliance on Coastal's mortgage of February, 1964. The February, 1961, mortgage showed a face amount of $8,000.00, which according to the testimony, was advanced for the purchase of 100 acres of land. Subsequent to this loan were further advances in the following amount:

| | | |
|---|---|---|
| Nov. 4, 1964 | $18,000.00 | (Note L) |
| Nov. 12, 1964 | $12,000.00 | (Note L also) |
| Dec. 22, 1964 | $45,000.00 | (Note M) |
| May 27, 1965 | $10,000.00 | (Note N) |
| June 4, 1965 | $ 1,000.00 | (Note O) |
| June 16, 1965 | $ 2,000.00 | (Note P) |
| August 5, 1965 | $ 2,000.00 | (Note R) |

The three mortgages of February 14, 1961, and the mortgage of February 6, 1964, in identical language, expressly provided that each is given, not only as security for the contemporaneous debt of even date, but as security for all existing indebtedness of mortgagor to mortgagee evidenced by promissory notes, for all future advances that may subsequently be made to mortgagor by mortgagee to be evidenced by promissory notes, and for all other indebtedness then due or to become due.

The three mortgages of February 14, 1961, and the mortgage of February 6, 1964, in identical language, also expressly provided that advances previously, contemporaneously, and thereafter made by mortgagee to mortgagor, and all indebtedness presently and thereafter owed by mortgagor to mortgagee, and any other present or future indebtednss of mortgagor to mortgagee would be secured by these instruments until they were satisfied of record.

Each of the mortgages were duly recorded and each remained unsatisfied of record. When the express wording of the mortgages is considered, plus the absurdity of a tract of land worth $8,000.00 securing outstanding debt balances ranging upwards to $86,644.96, Appellant's position that advances made by Coastal in December, 1964, and May, 1965, were secured only by the February, 1964 mortgage is untenable.

We affirm the findings of the Lower Court that Coastal's mortgage and subsequent advances made pursuant to the future advance clauses thereof, held priority over McMillen's mortgage.

LEWIS, C. J., LITTLEJOHN and NESS, JJ., and JOSEPH R. Moss, Acting Associate Justice, concur.