Merrimack
No. 2008-257

STATE EMPLOYEES ASSOCIATION OF NEW HAMPSHIRE, SEIU, LOCAL 1984 & a.

v.

NEW HAMPSHIRE DIVISION OF PERSONNEL

Argued: November 19, 2008
Opinion Issued: February 18, 2009

*Molan, Milner & Krupski, PLLC*, of Concord (*Glenn R. Milner* on the brief and orally), for the petitioners.

*Kelly A. Ayotte*, attorney general (*Michael K. Brown*, senior assistant attorney general, on the memorandum of law and orally), for the respondent.

HICKS, J. The petitioners, the State Employees Association of New Hampshire, SEIU, Local 1984 (SEA), William E. Evans and John R. Bush, appeal an order of the Superior Court (*Conboy*, J.) ruling that service credit purchased pursuant to RSA 100-A:4, VII (Supp. 2006) (repealed 2007) does not qualify for determining eligibility for medical benefits coverage under RSA 21-I:30 (Supp. 2008). We affirm.

The facts in this case are not in dispute. The petitioners are two state employees and the SEA, which describes itself as "a voluntary labor organization and the exclusive representative for more than 10,000 state employees who are eligible to receive certain retirement benefits from the [New Hampshire Retirement System (NHRS)]." The two individual petitioners, Evans and Bush, are apparently group I members of NHRS. Group I members are "employees and teachers," RSA 100-A:1, X(a) (2001), terms further defined in RSA 100-A:1, V and VI (Supp. 2008). The other classification of state employees referred to in this opinion is group II, whose members are "permanent policemen and permanent firemen," RSA 100-A:1, X(b) (2001), categories further defined and delineated in RSA 100-A:1, VII (Supp. 2008), VII-a (Supp. 2008), VII-b (2001) and VIII (2001). For reasons explained below, this decision concerns only the benefits available to some group I members.

The respondent, the New Hampshire Division of Personnel (division), is a division established within the department of administrative services, an agency of the state. RSA 21-I:1, :42 (Supp. 2008). The division is charged with, among other things, "[o]verseeing administration of all employee benefit programs other than those related to the [NHRS]." RSA 21-I:42, VIII.

Two types of state employee benefits are relevant to the instant action: retirement allowances payable by NHRS pursuant to RSA chapter 100-A (2001 & Supp. 2008), and "group hospitalization, hospital medical care, surgical care and other medical benefits," RSA 21-I:30, I, provided to state employees, state retirees and certain of their family members pursuant to RSA 21-I:26 to :36 (2000 & Supp. 2008). Both statutory schemes use some form of the term "creditable service" to calculate various benefits or to define eligibility for them. For instance, RSA 100-A:5, I(b) (2001) provides that the service retirement allowance payable thereunder to group I employee or teacher members is equal to a certain percentage of "the member's average final compensation multiplied by the number of years of creditable service."

RSA 21-I:30, which directs the state to pay a premium "toward group hospitalization, hospital medical care, surgical care and other medical benefits plan or a self-funded alternative" for, *inter alia*, retired employees of the state, uses a similar phrase to define that term. RSA 21-I:30 provides, in part:

> II. For the purposes of this section, "retired employee" means each group II state employee who retires. "Retired employee" also means each group I state employee who:
>
> > (a) Has at least 10 years of creditable service for the state if the employee's service began prior to July 1, 2003 or 20 years of creditable service if the employee's service began on or after July 1, 2003, and who also is at least 60 years of age at the time of retirement; or
> >
> > (b) Has at least 30 years of creditable service for the state at the time of retirement, regardless of the employee's age; . . . .
>
> . . .
>
> III. Any vested deferred state retiree may receive medical and surgical benefits under this section if the vested deferred state retiree is eligible. To be eligible, a vested deferred state retiree shall have at least 10 years of creditable service with the state if the employee's service began prior to July 1, 2003 or 20 years of

creditable service if the employee's service began on or after July 1, 2003. In addition, if the vested deferred state retiree is a member of group I, such retiree shall be at least 60 years of age to be eligible. If the vested deferred state retiree is a member of group II, such retiree shall not be eligible until 20 years from the date of becoming a member of group II and shall be at least 45 years of age.

IV. Each state employee who has at least 10 years of creditable service for the state if the employee's service began prior to July 1, 2003 or 20 years of creditable service if the employee's service began on or after July 1, 2003, and who elects to take a reduced service retirement allowance shall be defined as a "retired employee" for the purposes of being eligible to receive medical and surgical benefits under this section when the state employee reaches age 60.

RSA 21-I:30.

RSA 100-A:1 defines certain "words and phrases as used in [RSA chapter 100-A], unless a different meaning is plainly required by the context." RSA 100-A:1 (2001). In general, "creditable service," RSA 100-A:1, XVI (2001), means "service rendered while a member of the retirement system," RSA 100-A:1, XIV (2001), plus service under a predecessor retirement system "for which credit was given under the terms of one or more of the predecessor systems, and as set forth under this chapter," RSA 100-A:1, XV (Supp. 2008). *See* RSA 100-A:1, XVI (defining "[c]reditable service" to "mean prior service plus membership service, as provided in RSA 100-A:4"). The term "[s]ervice," in turn, is defined as "service as an employee, a teacher, a permanent policeman or a permanent fireman which is paid for by an employer." RSA 100-A:1, XIII (2001).

RSA chapter 100-A also offers limited opportunities for certain members to purchase credit for service rendered for public employers other than the State of New Hampshire, or for certain breaks in service. *See, e.g.*, RSA 100-A:4, VI (Supp. 2008) (allowing purchase of credit for active service in the United States armed services); :4, VIII (Supp. 2008) (allowing purchase of service credit following break in service to join Peace Corps or AmeriCorps); RSA 100-A:4-b (Supp. 2008) (allowing certain group I members to purchase credit for out-of-state service); RSA 100-A:4-c (Supp. 2008) (allowing certain group II members to purchase credit for out-of-state service). In 2006, the legislature enacted RSA 100-A:4, VII, which, until its repeal in 2007, allowed certain members of the retirement system to purchase up to five years additional credit. Specifically, RSA 100-A:4, VII provided:

VII. Notwithstanding any provision of this section, a member in active service in the retirement system who currently has at least 5 years of creditable service in the state, shall be entitled to receive credit for not less than one month nor more than 5 years of nonqualified service credit within the meaning of section 415(n) of the United States Internal Revenue Code of 1986, as amended, upon payment by the member of the full actuarial cost of such credit and upon approval of the board, subject to the following:

(a) Credit shall not be granted until the active member has fully paid for the nonqualified service in a lump sum or by installment payments as permitted by the board. The actuarial cost shall be the product of the member's annual rate of compensation at the time of buy-in, multiplied by the sum of the member and employer contribution rates in effect with respect to the member at the time of buy-in, multiplied by the number of years of nonqualified service credit bought. The member's payment shall be credited to the member annuity savings fund.

(b) "Nonqualified service credit" means time that is not otherwise purchasable under this chapter.

(c) Requests concerning the purchase of nonqualified service credit pursuant to this paragraph shall be limited to 2 such requests per member per calendar year.

RSA 100-A:4, VII.

On October 20, 2006, the division issued Personnel Memorandum 07-01 "to clarify whether the purchase of nonqualified service credit [under RSA 100-A:4, VII] impacts eligibility for state-paid retiree health benefits pursuant to RSA 21-I:30." The memorandum notes that the question is only relevant to group I members because RSA 21-I:30 does not tie the eligibility of group II members to years of creditable service. With respect to group I members, the memorandum states:

The language in RSA [21-I:30] requires a retiring Group I employee, in addition to meeting a number of other specified conditions, to have a certain number of years of "creditable service for the state" to qualify for the health care benefit. Nonqualified, non-state service is not "creditable service for the state" and for this reason, the purchase of nonqualified service credit would not count toward determining the eligibility of a Group I member for the state-paid retiree health benefit.

The petitioners brought the instant action seeking, *inter alia*, a declaratory judgment "that creditable service purchase[d] by a state employee pursuant to [RSA 100-A:4, VII] can be utilized for purposes of determining eligibility as a retired employee pursuant to RSA 21-I:30." (Emphasis omitted.) The division filed a motion to dismiss, which the trial court treated as a motion for summary judgment and granted. The court found the term "creditable service for the state" ambiguous and looked to legislative history to decipher its meaning. The court "acknowledge[d] that the language of RSA 100-A:4, VII is not a model of clarity," and found no indication in the legislative history of the lawmakers' intent in enacting it. From the intent expressed in the legislative history of RSA 21-I:30, however, the court concluded that "the legislature intended the phrase 'creditable service for the state,' as it is used in [that statute], to mean service actually working for the state." Thus, the court was "not persuaded that nonqualified service credit may be applied to establish eligibility to receive medical benefits in retirement" pursuant to RSA 21-I:30.

On appeal, the petitioners argue that the trial court erred in both its interpretation of the language of the statute and in its consultation of legislative history. "The interpretation of a statute is a question of law, which we review *de novo.*" *In the Matter of Liquidation of Home Ins. Co.*, 154 N.H. 472, 479 (2006) (quotation omitted). We are guided by a number of well-settled principles of statutory construction. "Our goal is to apply statutes in light of the legislature's intent in enacting them, and in light of the policy sought to be advanced by the entire statutory scheme." *Soraghan v. Mt. Cranmore Ski Resort*, 152 N.H. 399, 401 (2005). "When construing the meaning of a statute, we first examine the language found in the statute, and where possible, we ascribe the plain and ordinary meanings to words used." *Conrad v. Hazen*, 140 N.H. 249, 251 (1995) (quotation omitted). "We interpret statutes not in isolation, but in the context of the overall statutory scheme." *Appeal of City of Portsmouth*, 151 N.H. 170, 174 (2004). "When interpreting two statutes that deal with a similar subject matter, we construe them so that they do not contradict each other, and so that they will lead to reasonable results and effectuate the legislative purpose of the statutes." *Grand China v. United Nat'l Ins. Co.*, 156 N.H. 429, 431 (2007). "[W]e will not consider what the legislature might have said or add language that the legislature did not see fit to include." *In the Matter of Liquidation of Home Ins. Co.*, 154 N.H. at 479 (quotation omitted).

The parties first dispute the plain meaning of RSA 21-I:30. The division asserts that "[p]ursuant to RSA 21-I:30, the provision of health care benefits to retired state employees requires not just 'creditable service' but a term of actual '*service for the state.*' " The petitioners counter that "[t]he complete phrase 'creditable service for the state' is not defined by statute,

but the term 'creditable service' is and has a precise meaning. Thus, the plain meaning of 'creditable service for the state' is simply the amount of 'creditable service' a state employee has."

Upon reviewing the entire statutory scheme, we find the addition of the words "for the state" in RSA 21-I:30 neither helpful nor dispositive. First, that section uses the phrases "creditable service," RSA 21-I:30, II(a), III, "creditable service *for* the state," RSA 21-I:30, II(a), (b) (emphasis added), and "creditable service *with* the state," RSA 21-I:30, III (emphasis added), with no discernable distinction in intended meaning. Thus, the petitioners argue:

> [T]he [division's] position leads to an illogical and unreasonable result. The phrase 'creditable service for the state' is employed in only two of the three categories created by RSA 21-I:30[, II]. That is, a state employee with '20 years of creditable service' (not 'creditable service for the state') is entitled to benefits if employed on or after July 1, 2003 whereas the other two categories of eligible employees, under the [division's] view, would need to have their creditable service be actual work time for the state.

The petitioners also point out that where the legislature has intended to limit creditable service for purposes of eligibility for health benefits by requiring the performance of such service in the state, it has expressly said it. *See* RSA 100-A:4-b, I ("For such employee or teacher members, only creditable service performed in the state of New Hampshire as a member of the New Hampshire retirement system shall be counted as creditable service for the purpose of eligibility for medical and surgical benefits as a retired employee under RSA 21-I:30."); RSA 100-A:4-c (same). We find no consistent indication of legislative intent in the modification of "creditable service" by such phrases as "for the state."

The petitioners similarly argue that the existence elsewhere in the statute of explicit exclusions of purchased service credit from qualification as "creditable service for the state" for purposes of RSA 21-I:30 indicates that the legislature intended to include service credit purchased under RSA 100-A:4, VII. *See* RSA 100-A:4, VI(c) (providing that purchased credit for military service "shall not be used as creditable service . . . for the purpose of eligibility for medical and surgical benefits as a retired employee under RSA 21-I:30"); RSA 100-A:4-b, I, III (similar exclusion for credit for out-of-state service purchased by group I members); RSA 100-A:4-c, I, IV (similar exclusion for credit for out-of-state service purchased by group II members). The petitioners argue:

> When the Legislature enacted [RSA] 100-A:4, VII it did so with knowledge that when it intended to exclude certain purchased

creditable service from the ambit of RSA 21-I:30 it expressed this intent by adding clear exclusionary language. Conversely, then, by not adding in RSA 100-A:4, VII the exclusionary language found in several other provisions, there exists unmistakable legislative intent that such creditable service qualifies for purposes of eligibility for medical benefits under RSA 21-I:30.

(Citation and italics omitted.)

We acknowledge that "[t]he legislature's choice of language is deemed to be meaningful," *Conrad*, 140 N.H. at 251, and that we generally "assume[] that whenever the legislature enacts a provision, it has in mind previous statutes relating to the same subject matter," *Appeal of Town of Hampton Falls*, 126 N.H. 805, 809 (1985) (quotation omitted). Therefore, "[u]nless the context indicates otherwise, words or phrases in a provision that were used in a prior act pertaining to the same subject matter will be construed in the same sense." *Appeal of Town of Hampton Falls*, 126 N.H. at 810 (quotation omitted). Conversely, where the legislature uses different language in related statutes, we "assume that the legislature intended something different." *Conrad*, 140 N.H. at 252.

We also note the "elementary principle of statutory construction that all of the words of a statute must be given effect and that the legislature is presumed not to have used superfluous or redundant words." *Merrill v. Great Bay Disposal Serv.*, 125 N.H. 540, 543 (1984). To accept the division's position that "creditable service for the state," RSA 21-I:30, does not include purchased "creditable service" because the former term requires "a term of actual *service for the state*," renders the explicit exclusions in RSA 100-A:4, VI(c) and RSA 100-A:4-b, I, III and :4-c superfluous. The division attempts to distinguish military and out-of-state service credit from nonqualified service credit by noting:

> In the first instance, each statutory provision . . . [containing an explicit exclusion] specifically requires some form of actual service, albeit in a predecessor, military or out-of-state system. In this case, there is no actual service being performed by the employee. Instead, all they have to do is pay money to offset the cost of the annuity.

This distinction does not help the division, however, because RSA 21-I:30 does not mention actual service, but rather refers to creditable service for or with "the state." RSA 21-I:30. Thus, actual service performed for another governmental or public employer would not come within the plain meaning of RSA 21-I:30.

We also acknowledge, however, that to read "creditable service for [or with] the state" as simply referring to "creditable service" as that term is defined and used in RSA chapter 100-A renders the phrases "for the state" and "with the state" superfluous. Similarly, the division argues that to interpret "nonqualified service credit" purchased under RSA 100-A:4, VII as "creditable service" reads the term "nonqualified" out of that section. If the legislature intended to treat "nonqualified" service the same as creditable service, the division posits, it would not have distinguished it from creditable service, but rather would simply have allowed the purchase of creditable service. The petitioners, on the other hand, appear to argue that because the provision allowing purchase of "nonqualified service credit" is contained within the statutory section entitled "creditable service," the former is included in the definition of the latter.

As the foregoing analysis suggests, any attempt to read consistent and coherent meaning into every word of RSA chapter 100-A and RSA 21-I:30 may well be a fool's errand. Application of our standard rules of statutory construction to the provisions at issue produces conflicting results. Nevertheless, "all rules of statutory construction are subservient to the one that legislative intent must prevail if it can be reasonably discovered in the language used." 2A N.J. SINGER & J.D. S. SINGER, STATUTES AND STATUTORY CONSTRUCTION § 45.5, at 36 (7th ed. 2007); see McMillen Feed Mills, Inc. of S. C. v. Mayer, 220 S.E.2d 221, 226 (S.C. 1975) (stating same principle). Indeed, "[w]hen the intention of the Legislature can be ascertained from the statute, words may be modified, altered, or supplied so as to compel conformity of the statute to that intention." State v. Holmes, 136 P.2d 220, 222 (Mont. 1943) (quotation omitted). But cf., e.g., In the Matter of Liquidation of Home Ins. Co., 154 N.H. at 479 (stating standard rule of statutory construction that "we will not consider what the legislature might have said or add language that the legislature did not see fit to include"). Thus, in State v. Murgatroy, 115 N.H. 717, 718 (1975), we disregarded a mistaken reference in a statute to another statutory section and supplied the proper statutory reference where "the purpose, object, and intention of the legislature . . . [was] clear" and to apply the statute as written would defeat the legislature's intent.

■ In this case, interpreting the provisions at issue, as we must, "in the context of the overall statutory scheme," Appeal of City of Portsmouth, 151 N.H. at 174, we find the legislature's intent to exclude nonqualified service credit purchased under RSA 100-A:4, VII from the ambit of "creditable service for the state," as that phrase is used in RSA 21-I:30, reasonably

ascertainable. *See* SINGER & SINGER, *supra* § 45.5, at 36. We begin by examining the statutory scheme for retirement allowances contained in RSA chapter 100-A.

"The retirement system is financed through contributions from both employees and employers." *Upson v. Board of Trustees*, 124 N.H. 787, 789 (1984). NHRS' assets are held in two funds: the member annuity savings fund and the state annuity accumulation fund. RSA 100-A:16 (Supp. 2008). Assets are credited between the two funds "according to the purpose for which they are held." *Id.* The member annuity savings fund is the fund in which member contributions, which are deducted from the members' compensation "to provide for their member annuities," are accumulated "together with any amounts transferred thereto from a similar fund under one or more of the predecessor systems." RSA 100-A:16, I(a); *see* RSA 100-A:1, XX (2001) (defining "[m]ember annuity," as "annual payments for life derived from the accumulated contributions of the member"). Member contributions are deducted each payroll period from each member's compensation in an amount calculated as a specified percentage of the member's earnable compensation. RSA 100-A:16, I(a). "Each of such amounts, when deducted, shall be paid to the retirement system at such times as may be designated by the board of trustees and credited to the individual account, in the member annuity savings fund, of the member from whose compensation the deduction was made." *Id.* When a member retires, his or her accumulated contributions are transferred from the member annuity savings fund to the state annuity accumulation fund. RSA 100-A:16, I(d).

The state annuity accumulation fund is:

> the fund in which shall be accumulated all reserves for the payment of all state annuities payable from contributions made by employers, any amounts transferred thereto from a similar fund under one or more of the predecessor systems, amounts transferred from the member annuity savings fund, and all amounts paid to the system by or on account of call, substitute, or volunteer firemen and from which shall be paid all benefits payable under the system other than those payable from the member annuity savings fund.

RSA 100-A:16, II(a); *see* RSA 100-A:1, XXI (2001) (defining "[s]tate annuity" as "annual payments for life derived from contributions by an employer"). The amount of the employer's contribution is specified in RSA 100-A:16, II(c), which provides:

> The contributions of each employer for benefits under the retirement system on account of group I members shall consist of a

percentage of the earnable compensation of its members to be known as the "normal contribution", and an additional amount to be known as the "accrued liability contribution" . . . . The rate percent of such normal contribution in each instance shall be fixed on the basis of the liabilities of the system with respect to the particular members of the various member classifications as shown by actuarial valuation, except as provided in subparagraphs (h) and (i).

RSA 100-A:16, II(c). The accrued liability contribution is, essentially, an additional amount "necessary to liquidate the unfunded accrued liability on behalf of [each member] classification as determined by the actuary under [RSA 100-A:16, II(e).]" RSA 100-A:16, II(f) (Supp. 2008).

Except in the case of member contributions returned to members ceasing employment other than through retirement or death, *see* RSA 100-A:11 (Supp. 2008), the funds accumulated in the member annuity savings and state annuity accumulation funds are used solely to pay the retirement allowances of retired members. Thus, RSA 100-A:1, XXII (2001) defines "[r]etirement allowance" as "the sum of the member annuity and the state annuity." NHRS pays for medical benefits under very limited circumstances not at issue here, but through a separate fund. Specifically, RSA 100-A:52-b provides that NHRS:

shall pay the cost for permanent group hospitalization, hospital medical care, surgical care, and other medical and surgical benefits, in the employer-sponsored plan provided for active employees of a retiree's former employer, subject to the provisions of this section, for [a specified segment of group I retirees not relevant here].

RSA 100-A:52-b, I (Supp. 2008). RSA 100-A:53-d, I, currently provides:

The benefits provided under RSA 100-A:52-b shall be provided by a 401(h) subtrust of the New Hampshire retirement system. The 401(h) subtrust shall be funded by allocating 25 percent of future group I state employer contributions made for group I state employees in accordance with RSA 100-A:16 to the subtrust until such time as the benefits are fully funded. Thereafter, the subtrust shall receive only that portion of each year's contribution as is necessary to keep the benefits fully funded.

RSA 100-A:53-d, I (Supp. 2008) (amended 2008); *see* 26 U.S.C. § 401(h) (2000). Funds to be used for health benefits are segregated from those to be used for retirement allowances. RSA 100-A:53-d, II provides:

> All contributions made to the retirement system to provide medical benefits under RSA 100-A:52-b shall be maintained in a separate account, the 401(h) subtrust. All funds and accumulated interest shall not be used for or diverted to any purpose other than to provide said medical benefits. Similarly, none of the funds accumulated to provide the retirement benefits set forth in this chapter may be used or diverted to provide medical benefits under RSA 100-A:52-a. The funds, if any, providing medical benefits under RSA 100-A:52-b may be invested pursuant to the provisions of RSA 100-A:15.

RSA 100-A:53-d, II (Supp. 2007) (amended 2008). Except under the limited circumstances just described, the State itself pays the premiums under RSA 21-I:30 "within the limits of the funds appropriated at each legislative session." RSA 21-I:30.

Turning to the language of RSA 100-A:4, VII, two points are worth noting. First, the section required "payment by the member of the full actuarial cost of such credit" before the purchased service credit would be granted. RSA 100-A:4, VII. The actuarial cost of the purchased credit was defined to be "the product of the member's annual rate of compensation at the time of buy-in, multiplied by the sum of the member and employer contribution rates in effect with respect to the member at the time of buy-in, multiplied by the number of years of nonqualified service credit bought." RSA 100-A:4, VII(a). Thus, to purchase nonqualified credit, the member was required to pay the amounts that both he and his employer would have paid into the member annuity savings and state annuity accumulation funds, respectively, had the member actually performed the service at the time he purchased credit for it. Second, RSA 100-A:4, VII provided that the payment for the purchased nonqualified service credit was to be "credited to the member annuity savings fund." *Id.*

 Recalling that NHRS' assets are to be allocated between the member annuity savings and state annuity accumulation funds "according to the purpose for which they are held," RSA 100-A:16, and that the member annuity savings fund accumulates contributions deducted from members' compensation "to provide for their member annuities," RSA 100-A:16, I(a), it is clear that the money used to purchase nonqualified service credit was intended to be used to fund the purchasing members' retirement allowances and nothing else. In addition, the intention is manifest that the State, not having received the benefit of actual service, not itself incur any cost for the purchased credit.

■ For purposes of this appeal, we accept the division's assertion that "[b]ased on COBRA rates at the time this matter was before the trial court, it would cost the State between $513 and $1,912 per retiree, per month to fund RSA 21-I:30 as interpreted by the SEA." We conclude that the legislature did not intend nonqualified service credit purchased under RSA 100-A:4, VII to count toward eligibility for health benefits under RSA 21-I:30 in substantial part because the former statute mandates the payment of "the *full* actuarial cost of such credit," RSA 100-A:4, VII (emphasis added), yet defined that actuarial cost as only the actuarial equivalent of contributions for the members' retirement allowances and did not include the cost of health care benefits.

We note that the petitioners' attorney conceded at oral argument that an interpretation including purchased nonqualified service credit as creditable service for the State under RSA 21-I:30 would have a significant fiscal impact, a result we find contrary to the intent that the State bear no cost of the purchased credit. We further note that while the parties dispute the significance of a fiscal note attached to the bill enacting RSA 100-A:4, II, we need not discern that significance, which is equivocal at best, nor need we rely upon it, as the intent to bear no fiscal burden is made clear in the plain language of RSA 100-A:4, VII itself.

■ We further conclude that had the legislature intended to allow the purchase of credit qualifying for health care coverage under RSA 21-I:30, it would not have allocated all of the purchase money to the member annuity savings fund, a fund solely used to accumulate monies intended for the payment of retirement annuities. As previously noted, where NHRS does pay for all or part of the health benefits provided under RSA 21-I:30 to *retired group* I members, *see* RSA 100-A:52, V, VI, it does so not from the member annuity savings fund or the state annuity accumulation fund, but from a separate fund used solely for the purpose of funding health benefits.

Ultimately, our conclusion is buttressed by a review of the Internal Revenue Code (IRC) provisions referenced in the pertinent state provisions, as suggested by the division at oral argument. RSA 100-A:4, VII(b) explicitly refers to the type of service credit purchasable thereunder as "nonqualified service credit within the meaning of section 415(n) of the United States Internal Revenue Code of 1986 [IRC], as amended." RSA 100-A:4, VII. Section 415(n) of the IRC defines "[n]onqualified service credit" as "permissive service credit other than that allowed with respect to" certain governmental, educational or military service. 26 U.S.C.A. § 415(n)(3)(C) (Supp. 2008). Permissive credit, in turn, is defined in relevant part to mean:

service credit —

> (i) recognized by the governmental plan for purposes of calculating a participant's benefit *under the plan,*
>
> (ii) which such participant has not received under such governmental plan, and
>
> (iii) which such participant may receive only by making a voluntary additional contribution, in an amount determined under such governmental plan, which does not exceed the amount necessary to fund the benefit attributable to such service credit.

26 U.S.C.A. § 415(n)(3)(A) (emphasis added).

The division contends that because the plan referred to in 26 U.S.C.A. § 415(n)(3)(A)(i) is the plan providing retirement annuities administered by NHRS and not the medical benefits plan provided for in RSA 21-I:26 to :36 and administered by the commissioner of administrative services, *see* RSA 21-I:28 (Supp. 2008), nonqualified service credit has application only within the realm of retirement annuities, not medical benefits. The distinction is not so clear, however, as the IRC contemplates the payment of medical benefits, as well as retirement annuities, by a pension plan, and, as noted previously, NHRS itself funds such benefits in certain circumstances. Nevertheless, the limitations imposed on such benefits provide ample support for our interpretation of the state statutes at issue.

IRC section 401(h) provides, in pertinent part:

> Under regulations prescribed by the Secretary, and subject to the provisions of section 420, a pension or annuity plan may provide for the payment of benefits for sickness, accident, hospitalization, and medical expenses of retired employees, their spouses and their dependents, *but only if* —
>
> (1) such benefits are subordinate to the retirement benefits provided by the plan,
>
> (2) *a separate account is established and maintained for such benefits,*
>
> (3) the employer's contributions to such separate account are reasonable and ascertainable,
>
> (4) it is impossible, at any time prior to the satisfaction of all liabilities under the plan to provide such benefits, for any part of

the corpus or income of such separate account to be (within the taxable year or thereafter) used for, or diverted to, any purpose other than the providing of such benefits,

> (5) notwithstanding the provisions of subsection (a) (2), upon the satisfaction of all liabilities under the plan to provide such benefits, any amount remaining in such separate account must, under the terms of the plan, be returned to the employer . . . .

26 U.S.C. § 401(h) (emphases added). Thus, while nothing in 26 U.S.C.A. § 415(n) appears to preclude the legislature from allowing the purchase of nonqualified service credit that might be "recognized . . . for purposes of calculating a participant's [medical] benefit under the plan," 26 U.S.C.A. § 415(n)(3)(A)(i), had the legislature done so, it would have had to fund those benefits through a separate account in order to comply with 26 U.S.C. § 401(h). Nothing in RSA 100-A:4, VII or RSA 21-I:26 provides for such separate funding.

■ Based upon the foregoing, we conclude that nonqualified service credit purchased under RSA 100-A:4, VII applies as creditable service only with respect to retirement allowances under RSA chapter 100-A. Because we reach this conclusion based upon the plain language of RSA chapter 100-A, we need not address the parties' arguments regarding legislative history or administrative gloss. *See In the Matter of Liquidation of Home Ins. Co.*, 154 N.H. at 479 (noting that "[w]hen a statute's language is plain and unambiguous, we need not look beyond it for further indication of legislative intent").

*Affirmed.*

BRODERICK, C.J., and DALIANIS and DUGGAN, JJ., concurred.